Arthur Burghardt BANKS

v.

John J. NORTON, Warden, Federal Correctional Institution, Danbury, Connecticut.

Mitchell SNYDER

v.

John J. NORTON, Warden, Federal Correctional Institution, Danbury, Connecticut.

Robert STENNETT

v.

John J. NORTON, Warden, Federal Correctional Institution, Danbury, Connecticut.

John BACH

v.

John J. NORTON, Warden, Federal Correctional Institution, Danbury, Connecticut.

Civ. Nos. B–476, B–471, B–484, B–477.

United States District Court,
D. Connecticut.

June 19, 1972.

Judith M. Mears, Connecticut Civil Liberties Union, New Haven, Conn., for petitioners Banks, Stennett and Bach.

Dennis E. Curtis, New Haven, Conn., for petitioner Snyder.

Stewart Jones, U. S. Atty., Barry Cutler, Asst. U. S. Atty., New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

These habeas corpus applications, brought on behalf of four inmates confined in the Federal Correctional Institution, Danbury, Connecticut, were consolidated for the purpose of the hearings held on May 5, 8, and 11, 1972. In addition to the written stipulations of facts (see Appendix), the Court heard the testimony of each of the petitioners and certain officials of the prison. While the factual circumstances vary somewhat among the petitioners, the gravamen of the actions is a challenge to the administrative procedures by which the prison authorities discipline inmates.

On February 28, 1972, and continuing for several days thereafter, most of the prisoners at the Institution refused to perform their work duties. On the first day of the strike, petitioner Banks was confined in the Intensive Treatment Unit (hereinafter "ITU") on charges of threatening an officer and having a knife in his cell. Petitioners Stennett, Snyder, and Bach were committed to the ITU for failure to return to their jobs after the strike ended. Presently Banks is still in segregation, awaiting transfer to another federal prison; Stennett and Snyder have been returned to the general prison population; and Bach has been paroled.

Generally the petitioners contend that before they could be placed in segregation they were entitled to certain procedural due process protections:

1. Adequate notice of the charges against them;
2. The right to counsel or counsel substitute;
3. A hearing before an impartial Committee;
4. The right to call witnesses;
5. The right to confront and cross-examine adverse witnesses;
6. A complete transcript of the proceedings;
7. A written decision by the Committee; and
8. The right to appellate review.

The petitioners also complain that the prison lacks a written well-defined code of conduct for inmates, and, therefore, the prison officials should be ordered to promulgate a written set of standards to be distributed to all inmates.

Certain general legal principles are applicable. While it has been stated that many rights exercised by ordinary citizens necessarily must be limited in a prison environment, Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), it also has been emphasized that a court should not

be reluctant to interfere with internal prison management if there is a showing of arbitrary and unreasonable action by prison officials. Brooks v. Wainwright, 428 F.2d 652, 653 (5 Cir. 1970) (per curiam); Pierce v. La Vallee, 293 F.2d 233 (2 Cir. 1961). In a proper factual setting, a court should examine a challenged disciplinary ruling by prison authorities with respect to its purpose and the constitutional rights, if any, which may be affected. Cf. Seale v. Manson, 326 F.Supp. 1375, 1379 (D. Conn.1971). The court must recognize the difficulties inherent in the administration of a prison community and must respect the need for punishment when prison rules are violated by inmates; yet, at the same time it must be solicitous of the civil and personal rights of the prisoner.

■ Applying these standards to the facts of the instant cases, it seems clear the petitioners are not entitled to habeas relief. At the outset it should be noted that the officials were confronted with a major disruption of prison life; in effect they were faced with an outright mutiny. Cf. Braxton v. Carlson, 340 F.Supp. 999 (M.D.Pa., 1972). Prompt, effective action was required to reduce the tension and restore the prison to normalcy. The immediate segregation of Banks from the general community for threatening an officer and for possession of a weapon was entirely reasonable and necessary under the circumstances. The placement of the other petitioners in ITU for their failure to return to work after the strike was terminated also appears appropriate. In fact, in this Court's opinion, the severity of the punishment in the light of the magnitude of the petitioners' breaches was lenient. The main deprivations in the ITU are separation from the other inmates and restrictions on access to other buildings; the ITU cells are ventilated, lighted, heated, and maintained in a sanitary condition. Toilet and washing facilities are available and the ITU inmates enjoy reading privileges, and limited exercise periods. They are provided the usual prison clothing, mattresses, blankets and pillows, and are fed normal institution meals. In sum, the record does not disclose any circumstances which approach the level of a shocking deprivation of basic humane treatment toward these petitioners. Cf. Breeden v. Jackson, 457 F.2d 578, 580 (4 Cir. 1972); Rodriguez v. McGinnis, 451 F.2d 730 (2 Cir. 1971).

■ The question still remains, however, whether the petitioners in their disciplinary hearings were accorded the procedural requirements mandated by the due process clause. The principles enunciated in Sostre v. McGinnis, 442 F.2d 178 (2 Cir. 1971), cert. denied, sub nom. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); Cloud v. Manson, Civil No. 14,063 (D. Conn. May 3, 1972), and Bach v. Mitchell, Civil No. B–376 (D.Conn. Dec. 28, 1971), are dispositive of the following claims of rights to: counsel or counsel substitute; confront and cross-examine adverse witnesses; present witnesses; written notice of charges; a verbatim transcript; a written decision, with appellate review; and a codification of all prison regulations. It is sufficient that the inmates, as in the cases at bar, have notice of the behavior which results in a disciplinary proceeding and are afforded a reasonable opportunity to be heard by an impartial board. The remaining contentions of the petitioners will be ruled upon *seriatim.*

BANKS

■ 1) The proposed transfer of Banks to the Federal Penitentiary at Terre Haute, Indiana, is a matter within the discretionary power of the Bureau of Prisons. His argument that his actions in the confrontation with Captain Amstutz were reasonable self-defense tactics is insufficient to render the decision to transfer arbitrary and capricious. See Bach v. Mitchell, supra.

2) The Court declines to order Banks released from ITU for the following reasons:

a) The commitment to the ITU was reviewed by the Adjustment Committee on March 1 and March 10, 1972. The Good Time Forfeiture Committee considered the matter on March 13 and 14. At his recent appearance before the Adjustment Committee, convened to consider his status in the ITU, Banks walked out because he believed the proceedings were "pointless." Prison officials testified that Banks still remains in the ITU because of his "poor" and "explosive" attitude, and lack of proper adjustment while in the ITU. It seems clear Banks' own intransigence is the cause of his predicament, which does not warrant judicial intervention.

b) The claim that Banks did not know the purpose of Captain Amstutz's visit to his cell on February 28, which sparked the incidents for which Banks was committed to the ITU, is irrelevant. Captain Amstutz had every right to inspect Banks' cell at the time.

c) The contention that Banks was entitled to a hearing before being placed in the ITU on February 28 is rejected. Immediate segregation of Banks was justified under the circumstances.

d) The argument that the Adjustment Committee on March 1 and 10 was not an impartial tribunal has merit. Mr. Nave, a witness to the incident between the petitioner and Captain Amstutz, should not have been a member of the Committee. However, since petitioner was remanded to the ITU by a different panel, not including Nave, no prejudice has been demonstrated.

e) In any event, as soon as this Court vacates its order to retain Banks in this jurisdiction, the transfer to Indiana will follow and the issue will become moot.

3) The proceedings before the Good Time Forfeiture Committee did not violate any of Banks' constitutional rights. The hearing was conducted in substantial conformity to the requirements of Policy Statement 7400.6A issued by the Bureau of Prisons. Prior to the hearing Banks consulted with Attorney Judith Mears and presumably had the benefit of legal advice; the hearing was adjourned to permit witnesses to be called; the Committee properly exercised its discretion not to hear witnesses who would merely give cumulative testimony; the Committee carefully and fully considered the evidence; the punishment was not excessive or shocking; and the administrative appeal was not prejudicially infected by an inadequate record for review.

### SNYDER

Petitioner Snyder seeks a restoration of seven days' good time withheld by the Adjustment Committee, and an order requiring the Bureau of Prisons to promulgate a more detailed policy statement on disciplinary proceedings.

Following two appearances before the Adjustment Committee, Snyder had seven days' statutory good time withheld for the month of March. During these Committee hearings Snyder stated he did not know whether he was ready to return to work, refused to discuss the charge against him, and was generally uncooperative. Thereafter, the Committee reevaluated his punishment on three additional occasions and, on April 26, 1972, he was released from the ITU. The withholding of good time for the month was in complete conformity with the Board's policy statement and there is no basis for this Court to overrule the Committee's considered decision.

While the petitioner's complaints addressed to the lack of detailed disciplinary procedures have some merit, they do not reach constitutional dimensions. See Cloud v. Manson, supra. The Court does recommend, however, that the Bureau of Prisons promulgate detailed directives with sufficient detail to guide the actions of the members of prison disciplinary committees and to inform the inmates of the policies and

procedures which govern their appearances before these committees. The present policy statements are vague in many procedural aspects and should be revised.

STENNETT

 Stennett's claim that he could refuse prison work if it did not provide either pay or Industrial Good Time is without merit. While his position is understandable, the refusal to work constituted a violation of the prison rules. There is no constitutional right to a particular job in a correctional institution.

BACH

To the extent Bach's contentions have not been heretofore answered, they are considered moot by the Court because he is now on parole.

Accordingly, the petitions for habeas corpus are denied.

The order of this Court restraining the transfer of the petitioner Banks from the Danbury prison is continued for a period of ten days to permit counsel to pursue available remedies on appeal.

APPENDIX

*Stipulations—Arthur Burghardt Banks*

1. Arthur Burghardt Banks is an inmate at the Federal Correctional Institution, Danbury, having served six months of a five year sentence for a Selective Service violation.

2. Banks has been at Danbury since Nov. 18, 1971, and has never been punished for violent or assaultive behavior, or possession of weapons before the incident in question in this lawsuit.

3. Prior to the incident in question in this lawsuit, Banks was living in New Hampshire West.

4. Banks was placed in I.T.U. on Feb. 28, the first day of the strike.

5. Banks was never given a hearing before being placed in I.T.U.

6. Banks was charged with threatening an officer and having contraband homemade knives in his cell.

7. Banks made two appearances before the Adjustment Committee on March 1 and March 10.

8. Banks made two appearances before the Good Time Forfeiture Committee on March 13 and 14.

9. As a result of these hearings, Banks has been kept continually in I.T.U. until the present, has been ordered to forfeit 20 days of his good time and be transferred to Terre Haute.

10. At each of his adjustment committee hearings, Banks requested that he be represented by his counsel, Judith Mears, that he be permitted to call witnesses and cross-examine his accusers.

11. At each of his Good Time Forfeiture Hearings, Banks requested that he be represented by counsel, Judith Mears, and that a verbatim transcript of the proceedings be prepared.

*Stipulations—Mitchell Snyder*

1. Petitioner Mitchell Snyder is serving a three year sentence for violation of 18 U.S.C. § 2312 (interstate transportation of a stolen motor vehicle). According to the Bureau of Prisons, his mandatory release date is June 8, 1972.

2. While in federal custody, Snyder has never been punished for violent or assaultive behavior, or for possession of weapons.

3. Snyder began serving his sentence on March 3, 1970, and has been in federal custody continuously since then. He has served his sentence at federal institutions in Lompoc, California, Allenwood, Pennsylvania and Springfield, Missouri, as well as Danbury.

4. Prior to February 28, 1972, Snyder was working at Danbury in the education department as an orderly, and did his job satisfactorily. He received no pay or industrial good time for his work.

5. There was a work stoppage by inmates at Danbury from February 28, 1972, to March 8, 1972. During the strike there were no incidents of assaults by in-

mates, either against guards or other inmates. The strike was peaceful and there was minor property damage.

6. At the request of Respondent Warden Norton, made during the work stoppage, each inmate dormitory, or "house", elected two inmate representatives to meet with the prison administration on behalf of all the inmates. Snyder was elected to represent inmates in his house, and acted as a bargaining agent during the strike.

7. Snyder was confined to the Intensive Treatment Unit at the Federal Correctional Institution at Danbury from March 8, 1972 until April 26, 1972.

8. Snyder was present at Adjustment Committee meetings on March 9, 15, 20, April 3 and 26, and one meeting between April 3 and 26. At each of these meetings except the last, the Adjustment Committee decided to continue petitioner in the Intensive Treatment Unit.

9. At the Adjustment Committee meeting on April 26, the Committee decided to release Snyder to the general population, and he was released.

10. Since he was released from the Intensive Treatment Unit on April 26, 1972, Snyder has been working in the laundry. He has done his job satisfactorily. He receives no pay or industrial good time for this job.

11. At the Adjustment Committee meeting of March 15, the Committee decided to recommend that 7 days of statutory good time be withheld from Snyder. This recommendation was accepted by Respondent Warden Norton and 7 days of good time were withheld. This good time has not been restored to Snyder.

12. At none of the hearings described above, nor any other time, was Snyder told that he could appeal the decisions of the Adjustment Committee to continue him in the Intensive Treatment Unit or to withhold 7 days of his good time.

13. No regulation provides a procedure for an inmate to appeal a decision to confine him in the Intensive Treatment Unit, continue his confinement in the Intensive Treatment Unit, or withhold his good time.

March 9 Adjustment Committee meeting

1. Snyder went before the Adjustment Committee on March 9, 1972. The Committee consisted of Captain Dwight Amstutz, Caseworker Roger Benefiel, and Education Officer Cecil Nave.

2. The Institution's Report of the incident leading to his confinement in the Intensive Treatment Unit listed the offense as "Inciting". The institution's report of the incident on March 8 and the meeting the next day is attached to this stipulation. [Omitted from this appendix.]

3. Snyder admitted at the meeting that he raised his fist in the power salute at the time in question.

4. At the meeting on March 9, and at all subsequent meetings with the Adjustment Committee, Snyder requested the assistance of his lawyer, Dennis Curtis, who was available and prepared to assist him, but this request was refused by the Committee on every occasion.

5. Snyder denies, and denied at the hearing on March 9:—that he was ordered by Captain Amstutz not to salute—that his salute in any way "incited" other inmates to "adverse actions", as alleged in the Report.

6. During the March 9 meeting, Snyder was asked whether he supported the inmate work strike and whether he was willing to go back to work. He answered that he supported the strike and that he would not answer the latter question because it was irrelevant to the charge for which he was put into punitive segregation. The Committee told him that he would be held in the Intensive Treatment Unit because he supported the strike and because he would not answer their question about going to work.

7. It is Snyder's position that—his salute was a customary greeting among inmates, and could not reasonably be called "incitement"—he saluted on the morning of March 8 in response to the greetings of inmates in another dormitory while

he and others in his dormitory walked across the compound coming back from breakfast—his behavior was no different from that of 7 or 8 of the nine other inmates walking with him, and only 4 of them were subsequently punished for their behavior that morning.—Captain Amstutz's order to approximately 70 inmates forbidding a salute was merely a declaration that the demonstration was over. These inmates could have explained the order if Snyder had been permitted to call them as witnesses on his own behalf.

March 15 Adjustment Committee meeting

1. Snyder went again before the Adjustment Committee on March 15. The Committee consisted of Captain Amstutz, Caseworker Sam Fine, and a third official.

2. Snyder requested the aid of counsel, the right to confront his accuser, and the right to call witnesses on his behalf, but these requests were denied.

3. Snyder answered the charge by saying that he was not being held in the Intensive Treatment Unit for refusing to work, and that he did not see why he should be required to answer this hypothetical question. Snyder did not say he would not work.

4. At the conclusion of the March 15 meeting, the Committee recommended that Snyder be continued in the Intensive Treatment Unit and that 7 days of good time be withheld from him. Both of the recommendations were accepted by Respondent Warden Norton.

5. The institution's report of the March 14 incident and the March 15 meeting is attached to this stipulation. [Omitted from this appendix.]

March 20 Adjustment Committee meeting

1. Snyder appeared again before the Adjustment Committee on March 20. The Committee consisted of Captain Amstutz, Chief of Classification and Parole William Key and education officer Nave.

2. At that meeting, Snyder was asked whether he would return to work. He answered that he was not being held in the Intensive Treatment Unit for refusal to work, so he thought the question was irrelevant and would therefore not answer it. He did not refuse to work.

3. The Committee recommended that Snyder be continued in the Intensive Treatment Unit, and Respondent Warden Norton followed the recommendation.

4. The institution's report of the March 20 meeting is attached to this stipulation. [Omitted from this appendix.]

April 3 Adjustment Committee meeting

1. Snyder appeared again before the Adjustment Committee on April 3. The Committee consisted of Captain Amstutz, William Key, and education officer Nave.

2. The Committee asked him if he had anything to talk about, Snyder read them a statement he had previously prepared, discussed it briefly with the Committee, and left. A copy of that statement is attached. [Omitted from this appendix.] The Committee recommended that he be continued in the Intensive Treatment Unit, and Respondent Warden Norton followed the recommendation.

April 26 Adjustment Committee meeting

1. Snyder appeared again before the Adjustment Committee on April 26. The Committee consisted of Captain Amstutz, William Key, and education officer Nave.

2. Snyder at this time, as at each prior hearing, requested assistance of counsel. Snyder stated that he did not think he should discuss anything on account of pending litigation involving his custody.

3. Snyder was asked, "Will you return to work, and what job do you want?" He answered that he had never refused to work during the last 7 weeks. He was asked: "You do not refuse?", and again replied, "I have never refused."

4. Snyder was then told that he would be released from the Intensive Treatment Unit at 6 p. m.

5. Snyder asked the Committee why he had been kept in punitive segregation for 7 weeks and had 7 days of good time withheld from him, since he had never refused to work. He was told, "Your case

is in litigation and your question will be answered at that time."

6. Captain Amstutz then informed him that he would be released and assigned to work in the laundry.

Description of Intensive Treatment Unit

The Intensive Treatment Unit at the Federal Correctional Institution at Danbury consists of approximately 36 cells divided among 3 tiers. Each cell is approximately 6′ x 9′ in size, and is furnished with a bed, a single light bulb, a sink with running water, and a toilet bowl. The cells are enclosed by solid walls on 3 sides and bars on the 4th side. The cells do not face each other, but face outward toward a walkway. The walkway is enclosed in steel mesh, and there is an open space of about 30 feet between the steel mesh and the outside of the building that encloses the cell block.

Inmates confined to the Intensive Treatment Unit for purposes of punishment are customarily not allowed out of their cells during the 1st 2 weeks of their confinement. According to the policy of the Institution, after 14 days inmates are permitted to exercise for 1 hour each day outside their cells, but petitioners in this case were allowed only 10 minutes per day of exercise. Persons confined to the Intensive Treatment Unit are denied access to all educational offerings at the institution, may not attend movies or other entertainments, may not watch television, may not work and thereby earn money or industrial good time, may not attend religious services, may not use the athletic exercise equipment on the compound, may not see visitors at the institution's park area (this restriction continues for 60 days after release) with the understanding attorneys and family may visit inmates in the Intensive Treatment Unit, may not associate with friends at the institution, may not shower more than twice a week, and must eat all their meals in their cells.

Although inmates in the Intensive Treatment Unit can communicate with each other verbally, they must shout to make themselves heard.

1. The Model Act for the Protection of the Rights of Prisoners, published in 1972 by the National Council on Crime and Delinquency, prepared by a committee of 9 correctional experts which included Respondent Norman Carlson, represents the current view of correctional experts on matters of inmate discipline. A copy of the Model Act for the Protection of the Rights of Prisoners is attached to this stipulation. [Omitted from this appendix.]

Federal inmate Paul McAlee is now at the Federal Penitentiary at Lewisburg, Pennsylvania. He was at the Federal Correctional Institution at Danbury during and after the inmate work stoppage. He will testify:

A) That he was placed in the Intensive Treatment Unit on March 10 for not working.

B) That while confined in the Intensive Treatment Unit he submitted a written request on March 23 that he be allowed to return to work, but in spite of this request he was not released from the Intensive Treatment Unit until April 16, when he was taken directly to Lewisburg.

Stipulation

1. William Anthony Goodwin is an inmate of the Federal Correctional Institution at Danbury. He was at Danbury before, during and after the work stoppage that took place between February 28, 1972, and March 8, 1972.

2. He will testify:

A) That he was confined to the Intensive Treatment Unit from March 8 to April 3 on a charge of "incitement", which was based on the same incident for which Snyder was charged.

B) That Captain Amstutz did not give an order to himself and Snyder not to salute, contrary to the allegation contained in Paragraph 15 of Captain Amstutz's affidavit of April 5, 1972.

C) That the salute he gave on March 8, for which he was charged with incitement, was in fact merely a customary greeting among inmates, and was given in response to the greetings of other inmates, and so could not

properly be called "incitement" of the inmates.

D) That on March 23 he submitted a written request to the Adjustment Committee that he be allowed to return to work, but he was not released until April 3.

*Stipulations—Robert Stennett*

1. Robert Stennett is an inmate at the Federal Correctional Institution, Danbury, serving a four year sentence for violation of the Dyer Act (18 U.S.C. § 2312, interstate transportation of a stolen motor vehicle). He is scheduled to be released in October.

2. Robert Stennett has been at Danbury since February, with no prior disciplinary reports.

3. While in federal custody, Robert Stennett has never been punished for violent or assaultive behavior, or possession of weapons.

4. Before the incident in question in this lawsuit, Robert Stennett was living in Concord House and assigned to Central Custodial Services, where he was working satisfactorily.

5. Robert Stennett did not work during the week-long stoppage at the institution from February 28 to March 6.

6. There were no incidents of violence or assaults upon staff or other inmates on the compound associated with the work stoppage.

7. Robert Stennett was one of two duly elected representatives from his house to the inmate committee, which was recognized by the prison administration.

8. On March 8, Robert Stennett was moved from Concord House to Providence House with the other inmates who did not immediately return to their jobs.

9. On March 10, Robert Stennett was placed in I.T.U. where he was confined until April 10.

10. Robert Stennett was never given a hearing before being placed in I.T.U.

11. Robert Stennett made two appearances before the Adjustment Committee on March 20, April 3 and April 10.

12. Robert Stennett was charged with refusal to work.

13. As a result of Adjustment Committee hearings, Robert Stennett was penalized by withholding seven days good time for the month of March.

14. At none of the hearings at which Robert Stennett appeared was he told that he could appeal the decision of the Adjustment Committee to continue him in I.T.U. or withhold seven days good time.

15. No formal administrative procedure exists by which an inmate can appeal a decision to confine him to I.T.U. or continue his confinement in I.T.U. or withhold good time.

16. Since his release from I.T.U., Robert Stennett has worked satisfactorily at his old job at Central Custodial Services.

*Stipulations—John Bach*

1. John Bach was released on parole from the Federal Correctional Institution, Danbury on April 24, 1972 after serving 35 months of a six year sentence for a Selective Service violation. He will be on parole for three years.

2. While in federal custody, John Bach has never been punished for violent or assaultive behavior, or possession of weapons.

3. John Bach has no other prior state or federal convictions.

4. Before the incidents in question in this lawsuit, John Bach was living in Concord House and assigned to a grounds maintenance crew, where he was working satisfactorily.

5. John Bach did not work during the week-long stoppage at the institution from February 28 to March 6, 1972.

6. There were no incidents of violence or assaults upon staff or other inmates on the compound associated with the work stoppage.

7. John Bach was one of two duly elected representatives from his house to the inmate committee, which was recognized by the prison administration.

8. On March 6th, the work stoppage ended, and John Bach was moved from Concord House to Providence House with

the other inmates who did not immediately return to their jobs.

9. On March 8th, John Bach was placed in the Intensive Treatment Unit, where he was confined until April 24.

10. John Bach was never given a hearing before being placed in I.T.U.

11. John Bach made two appearances before the Adjustment Committee on March 9 and April 5, and refused appearances on March 15 and 20.

12. As a result of Adjustment Committee hearings, John Bach was kept in I.T.U. for the duration of his stay at the Federal Correctional Institution, Danbury. (Because he was sentenced under the Youth Corrections Act, he could neither earn nor lose good time).

13. John Bach was charged with "shouting out a window", "making the power sign", "refusing to give an officer his number", and "rhythmic clapping in the cafeteria."

14. At none of the hearings at which John Bach appeared was he told that he could appeal the decision of the Adjustment Committee to continue him in I.T.U.

15. No formal administrative procedure exists by which an inmate can appeal a decision to confine him to I.T.U. or continue his confinement in I.T.U.