**Santiago DIAZ et al., Plaintiffs,**

v.

**Caspar W. WEINBERGER, as Secretary of the Department of Health, Education and Welfare of the United States, Defendant.**

**Civ. No. 72–1312.**

United States District Court,
S. D. Florida,
Miami Division.

June 11, 1973.

As Corrected Aug. 30, 1973.

Alfred Feinberg, Legal Services of Greater Miami, Inc., Miami, Fla., for plaintiffs.

Raymond B. Ray, Asst. U. S. Atty., Miami, Fla., Randolph W. Gaines, Social Security Division, Office of the Gen. Counsel, Dept. of Health, Education and Welfare, Baltimore, Md., for defendant.

Before DYER, Circuit Judge, and EATON and KING, District Judges.

## MEMORANDUM OPINION

JAMES LAWRENCE KING, District Judge:

This action challenges the constitutionality of the eligibility requirement for aliens who wish to enroll in the supplemental medical insurance plan established as part of the Medicare program. Section 1836(2)·(A)(ii) of the Social Security Act of 1935, as amended, 42 U.S.C. § 1395o(2)(A)(ii) (1970), disqualifies all aliens from benefits but those lawfully admitted for permanent residence who have resided in the United States continuously for five years prior to making application for enrollment.[1]

The supplemental medical insurance program, 42 U.S.C. § 1395j et seq. (1970), pays a substantial part of the cost of physicians' services, home health care, diagnostic tests, and medical appliances. 42 U.S.C. §§ 1395k, 1395x(m, s) (1970). Unlike Medicare's companion hospital insurance plan, 42 U.S.C. § 1395c et seq. (1970), one-half of the cost of the supplemental insurance program is financed by monthly premiums paid by individuals aged 65 or older who choose to enroll. 42 U.S.C. § 1395r(b) (1970).

Plaintiffs, who are Cuban refugees, seek injunctive and declaratory relief against operation of the alien eligibility provision on behalf of themselves, a class and sub-class of aliens similarly situated, pursuant to Fed.R.Civ.P. 23(a), (b)(2) and (c)(4). They charge that because the eligibility provision applies to aliens, but not to citizens, it discriminates invidiously against them in violation of the due process clause of the fifth amendment. A three-judge court was convened to consider their claim in accordance with 28 U.S.C. §§ 2282, 2284 (1970). The parties have stipulated, and we find, that no factual issues remain in dispute and that this action is ripe for decision on their opposing motions for summary judgment.

## JURISDICTION

The court possesses jurisdiction pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (1970),[2] and we therefore need not con-

1. Section 1836 provides:
    "Every individual who—
    (1) has attained the age of 65, and
    (2) (A) is a resident of the United States, and is either (i) a citizen or (ii) an alien lawfully admitted for permanent residence who has resided in the United States continuously during the 5 years immediately preceding the month in which he applies for enrollment under this part, or (B) is entitled to hospital insurance benefits under part A,
    is eligible to enroll in the insurance program established by this part."
    42 U.S.C. § 1395o (1970).

2. Judicial review of supplemental medical insurance entitlement determinations is governed by Section 1869 of the Social Security Act of 1935, as amended, which provides in pertinent part:
    "Any individual dissatisfied with any determination . . . as to entitlement under . . . part B [the sup-

plemental medical insurance plan] . . . shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 205 (b) of this title, and, in the case of a determination as to entitlement, . . . to judicial review of the Secretary's final decision after such hearing as is provided in section 205 (g) of this title."
42 U.S.C. § 1395ff(b) (1970). Section 205(g) of the Act in turn provides in pertinent part:
    "Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or re-

sider the other jurisdictional allegations of the complaint.[3] Although § 205(g) by its terms mandates a "final decision" by the Secretary prior to judicial review, to require plaintiffs to exhaust their administrative appeals would be to demand a futile act.

The purpose of § 205(g) is to "delay judicial review until (1) findings of fact are made by the Secretary or (2) the Secretary has had an opportunity to correct a lower level administrative error." Morris v. Richardson, 346 F. Supp. 494, 495 (N.D.Ga.1972) (three-judge court), appeal dismissed sub nom. Morris v. Weinberger, 410 U.S. 422, 93 S.Ct. 1408, 35 L.Ed.2d 394 (1973). Neither problem is presented here. No factual issues remain in dispute, and 42 U.S.C. § 1395o(2)(A)(ii) (1970) places the Secretary under a ministerial duty to deny plaintiffs' applications for enrollment for supplemental benefits. Under these circumstances, we think it unnecessary for the named plaintiffs, who have applied for benefits, to pursue formalistic administrative appeals of initial adverse determinations.

Likewise, the general exhaustion doctrine is inapplicable to this case because plaintiffs challenge the statute's constitutionality. It is settled that "[w]here a plaintiff attacks the constitutionality of the statute under which an administrative agency acts, and the attack does not turn upon a factual determination requiring administrative expertise, the doctrine of exhaustion of administrative remedies does not apply." Gainville v. Richardson, 319 F.Supp. 16, 18 (D. Mass.1970) (three-judge court), citing Public Util. Comm'n v. United States, 355 U.S. 534, 539, 78 S.Ct. 446, 2 L.Ed. 2d 470 (1958); Oestereich v. Selective Serv. Bd., 393 U.S. 233, 242, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); cf. King v. Smith, 392 U.S. 309, 312 n. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

## CLASS ACTION DEMAND

Plaintiffs have moved for certification of this case as a class action with one sub-class pursuant to Fed.R. Civ.P. 23(a), (b)(2) and (c)(4).[4] The parties have stipulated that plaintiffs Diaz and Clara are Cuban refugee immigrants who have been welcomed for residence in the United States,[5] but who have neither resided in the United

versing the decision of the Secretary, with or without remanding the cause for a rehearing."
42 U.S.C. § 405(g) (1970).

3. Plaintiffs also alleged jurisdiction under 28 U.S.C. §§ 1331, 1361 and 5 U.S.C. § 702 (1970).

4. Plaintiffs' motion requested representation of a class consisting of:
"All persons in the United States who have been or will be denied enrollment under the Medicare Program, 42 U.S.C. § 1395 et seq. because of their failure to meet the citizenship or residency requirements of 42 U.S.C. § 1395o(2)(A)(i) and (ii)."
They also sought to represent a sub-class of:
"All non-citizens in the United States who have attained permanent resident status, who have been or will be denied enrollment under the Medicare Program because of their failure to meet the five-year continuous residency requirement of 42 U.S.C. § 1395o(2) (A)(ii)."

These proposed definitions are overbroad. Plaintiffs do not challenge their denial of enrollment in the entire "Medicare Program," which contains a similar alien eligibility provision for its hospital insurance plan, 42 U.S.C. § 426a(a)(4) (1970), but only the eligibility requirement for the supplemental medical insurance plan. In addition, the class plaintiffs Diaz and Clara propose to represent would include all aliens from ambassadors to vessel crew members. Such a definition finds no support in the stipulated facts, nor do we think it can comport with the requirement of Fed.R. Civ.P. 23(a)(3) that the claims or defenses of the representative parties be typical of those of the class. We will therefore make appropriate emendations to narrow the definitions of the class and sub-class certified.

5. Plaintiffs Diaz and Clara, like many other Cuban refugees, were "paroled" into the United States by the Attorney General, and remain here at his discretion. 8 U.S.C. § 1182(d)(5) (1970). As pa-

States continuously for five years nor been lawfully admitted for permanent residence within the statutory meaning of that term.[6] Plaintiff Espinosa has

been lawfully admitted for permanent residence, but has not yet resided in the United States continuously for five years. All have applied for enrollment

rolees, they were allowed to reside in this country without regard to openings in the numerical limitations for immigrants. 8 U.S.C. §§ 1151, 1101(a)(27); Act of Oct. 3, 1965, Pub.L.No.89–236, § 21(e), 79 Stat. 911. Although parole of an alien "shall not be regarded as an admission," 8 U.S.C. § 1182(d)(5) (1970), and does not ordinarily place him "legally within the United States," Ma v. Barber, 357 U.S. 185, 189–190, 78 S.Ct. 1072, 2 L.Ed. 2d 1246 (1958), we think that the special legislation which authorizes the adjustment of status of Cuban parolees to that of lawful admission for permanent residence implicitly recognizes that their parole contemplates something more in the nature of an entry than a detention. Act of Nov. 2, 1966, Pub.L.No.89–732, 80 Stat. 1161, *in* 8 U.S.C. § 1255 note (1970). *See* note 6 *infra*.

In addition to parole, there is one other significant way for immigrant aliens to avoid the numerical limitations and to gain admission to the United States. A limited number of "conditional entry" permits is available to aliens uprooted from their homeland by designated natural catastrophes and by persecution either in Communist-dominated nations or in countries in the Middle East. 8 U.S.C. § 1153(a)(7) (1970).

6. The Secretary defers to factual determinations by the Attorney General that an alien seeking enrollment in Medicare comes within the statutory meaning of this phrase, pursuant to Social Security Ruling 68–38 which states, in pertinent part:

"The phrase 'lawfully admitted for permanent residence', as found in section 103(a)(4) of P.L. 89–97 and section 1836(2)(A) of Title XVIII, is a term of art adopted from the Immigration and Nationality Act, in section 101(a)(20) of which it is defined (8 U.S.C. § 1101(a)(20) (1970)). Accordingly, the phrase has the same meaning in Title XVIII as it does in the Immigration and Nationality Act. The Administration, in its determinations under sections 103 and 1836 is obliged to accept the determinations of the Attorney General and his delegates as to the fact of lawful admission, since only that official is authorized by statute to make such determinations."

Social Security Administration, 1968 Cum.Bull. 197, *in* 1 Unempl.Ins.Rep. ¶ 15,064 at 2499–289; *cf.* Social Security Administration, Claims Manual, pt. 10, §§ 10108.7–10108.9 (1973).

Under the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1101 et seq. (1970), every applicant for admission to the United States is presumed to be an immigrant seeking lawful admission for permanent residence until he demonstrates that he is entitled to admission as a nonimmigrant. 8 U.S.C. § 1184 (1970); *see* note 8 *infra*. An immigrant who meets the other requirements for admission must await an opening in the numerical limitations before he may be issued an immigrant visa and, upon arrival, acquire permanent residence status. 8 U.S.C. § 1151(a) (1970).

Aliens who arrive in the United States not as immigrants, but as parolees, conditional entrants or nonimmigrants may, in some cases, later obtain adjustment of their status to that of permanent residence. Thus, Cuban parolees like plaintiffs Diaz and Clara become eligible for an adjustment of status after being "physically present in the United States for at least two years." Act of Nov. 2, 1966, Pub.L.No.89–732, 80 Stat. 1161, *in* 8 U.S.C. § 1255 note (1970). Upon making application, the Cuban parolee faces a further delay, which we are informed is now approximately two years, while he awaits an opening in the Western Hemisphere numerical limitation. *Id.; see* note 5 *supra*. After acquiring a place in the quota and a determination of admissibility from the Attorney General, he is entitled to permanent residence status retroactive, in most cases, to the date of his admission. *Id.* It is important to note, however, that in practice Cuban parolees cannot ordinarily obtain permanent residence status until they have resided in the United States for four years or more.

Likewise, conditional entrants may obtain permanent residence status retroactive to the date of their entry after residing in the United States for at least two years. 8 U.S.C. § 1153(g, h) (1970). With the exception of alien crewmen and natives of countries of the Western Hemisphere, other aliens may obtain adjustments of their status at the discretion of the Attorney General no

in the supplemental medical insurance program and been rejected.[7]

■ Plaintiffs submit, and we find, that each of the prerequisites for maintenance of a class action pursuant to Rules 23(a) and (b)(2) has been met with respect to both the class and subclass hereinafter defined. The class certified in this action shall consist of:

> All immigrants [8] residing in the United States who have attained the age of 65 and who have been or will be denied enrollment in the supplemental medical insurance program under Medicare, 42 U.S.C. § 1395j et seq. (1970), because they are not aliens lawfully admitted for permanent residence who have resided in the United States continuously during the five years immediately preceding the month in which they apply for enrollment as required by 42 U.S.C. § 1395o(2)(A)(ii) (1970).

Pursuant to Rule 23(c)(4), we will also certify a sub-class consisting of:

> All immigrants lawfully admitted for permanent residence in the United States who have attained the age of 65 and who have been or will be denied enrollment in the supplemental medical insurance program under Medicare, 42 U.S.C. § 1395j et seq. (1970), solely because of their failure to meet the five-year continuous residency requirement of 42 U.S.C. § 1395o(2)(A)(ii) (1970).

## EQUAL PROTECTION STANDARD

Whether the compelling governmental interest test or the rational basis criterion provides the applicable standard by which the constitutionality of the alien eligibility provision must be assessed presents the threshold question for consideration. Defendant contends that because this case falls within the area of economic and social welfare legislation, it must ipso facto be governed by the rule that the "Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification." Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L. Ed.2d 1435 (1960); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L. Ed.2d 491 (1970); Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); Lindsey v. Normet, 405 U. S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). But the government's reliance on *Flemming* and its progeny is inapposite to the extent that none of those cases involved even a colorable claim of discrimination.

---

matter how they first lawfully gained admission into the United States, provided that there is an opening in the numerical limitations. 8 U.S.C. § 1255 (1970). Adjustments may also be made by the Attorney General to avoid hardships in the case of deportable aliens, 8 U.S.C. § 1254 (1970), and aliens who arrived in the United States prior to July 1, 1924. 8 U.S.C. § 1259 (1970).

7. Plaintiff Espinosa's claim denial notice does not appear of record, but 42 U.S.C. § 1395o(2)(A)(ii) (1970) imposes upon the Secretary a ministerial duty to reject his application, and we proceed upon the assumption that the Secretary did not act improperly.

8. The word "immigrant" is a term of art employed by the Immigration and Na-

tionality Act of 1952, which is defined as "*every* alien except an alien who is within one of the . . . classes of nonimmigrant aliens." 8 U.S.C. §.1101(a) (15) (1970) (emphasis added). Twelve categories of nonimmigrant aliens are explicitly enumerated by the Act and include, for example, diplomatic personnel, short-term visitors for business or pleasure, crewmen, students, braceros and foreign correspondents. *Id.* We use the term in its technical sense, which encompasses conditional entrants, as well as to include those who, like Cuban parolees, may become immigrants through retroactive adjustments of status and whose parole contemplates something more in the nature of an entry than a detention. *See* note 5 *supra*.

Plaintiffs respond that the deprivation they suffer from denial of eligibility for supplemental medical insurance can only be justified if "necessary to promote a compelling governmental interest," Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969), because the classification they challenge, as one based on alienage, is "inherently suspect," Graham v. Richardson, 403 U.S. 365, 376, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971); Takahashi v. Fish & Game Comm'n, 334 U.S. 410 (1948); Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); cf. Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed. 2d 768 (1972); Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and burdens their access to one of the "necessities of life" in which they assert a "fundamental right." Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Dunn v. Blumstein, 405 U. S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Shapiro v. Thompson, supra; Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

But plaintiffs' invocation of cases requiring a compelling interest to justify classifications burdening or infringing certain fundamental constitutional rights is not entirely persuasive. Although we cannot denigrate the importance of medical care to the aged, or the possibility that its deprivation may amount to the denial of the constitutional right to life itself, it is far from clear that the denial of such "necessities of life" alone justifies application of the compelling interest standard. Compare Graham v. Richardson, 403 U.S. at 380, 91 S.Ct. at 1856 with Lindsey v. Normet, 405 U.S. at 73–74, 92 S.Ct. at 874. Moreover, the very infancy of this, the first

Congressional enactment ever to provide medical care benefits, cautions against presuming it to be a "fundamental right," the denial of which necessitates a high level of legislative justification. Cf. Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). On the contrary, in the absence of an apparent or presumptive discriminatory purpose or effect, the courts have refrained from applying the compelling interest standard to social benefit legislation. E.g. Lindsey v. Normet, supra; Jefferson v. Hackney, supra; Richardson v. Belcher, supra; Dandridge v. Williams, supra.

■ Likewise, plaintiffs' reliance on decisions imposing a compelling interest standard on classifications deemed "inherently suspect" proves too much. Such a per se rule is doubtless appropriate where classifications are "based on unalterable traits such as race and lineage." Lindsey v. Normet, 405 U.S. at 73, 92 S.Ct. at 874 (footnotes omitted). But the fact that alienage is a governmentally created status suggests that it may not constitute such a consistently illegitimate distinction as to warrant mechanical application of the compelling interest test.[9] Indeed, the leading case treating alienage as an "inherently suspect" distinction avoided the express use of that test, Graham v. Richardson, 403 U.S. at 375–376, 91 S.Ct. at 1854, although some more recent alienage decisions have held Congress to the compelling interest standard. E.g. Jalil v. Hampton, 148 U.S.App.D.C. 415, 460 F.2d 923 (1972); Faruki v. Rogers, 349 F.Supp. 723 (D.D.C.1972).

Although we cannot say that Congress may never be held to a lesser constitutional standard than the states, but see Morris v. Richardson, 346 F.Supp. at 499, neither can we accept the view that Congress may never be held to the same standard. For example, to differentiate between citizens and aliens in regulating entry into the United States

9. See Note, Protection of Alien Rights Under the Fourteenth Amendment, 1971 Duke L.J. 583, 594–97 (1971).

may be a presumptively proper exercise of Congressional power, whereas a like discrimination by legislatures regulating entry into the states would not: different fourteenth and fifth amendment constitutional tests might therefore be appropriate. *Cf.* Graham v. Richardson, *supra;* Shapiro v. Thompson, *supra.*

Inversely, there are occasions when the compelling interest test might just as appropriately be applied to Congressional enactments as to those of state legislatures. For example, the fact must not be overlooked that aliens are not simply politically disadvantaged, as are members of other "inherently suspect" classifications: they lack the power of the ballot entirely at both the state and federal levels. Moreover, aliens have endured a long history of open discrimination at the hands of the political process. *See, e.g.,* Oyama v. California, 332 U.S. 633, 651 n. 1, 68 S.Ct. 269, 277, 92 L.Ed. 249 (1948) (Murphy, J., concurring). Because the political system provides no check on such discrimination, there may well be instances when application of a compelling interest standard is warranted in review of state and federal enactments to protect aliens from discrimination resulting from their lack of political representation.

■ If it is a close question whether the compelling interest standard should be applied to a classification based on alienage under the circumstances here, we think similar considerations permit the conclusion that, whatever the standard, the protection of fifth amendment due process is available to remedy such claims of discrimination against aliens as appear in this case. It is settled, at least, that aliens lawfully residing in the United States are "persons" within the meaning of both the fourteenth and fifth amendments, and are entitled to their protection. Harisiades v. Shaughnessy, 342 U.S. 580, 586 n. 9, 72 S.Ct. 512, 517, 96 L.Ed. 586 (1952); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915).

Moreover, even though fourteenth amendment notions of equal protection are not entirely congruent with fifth amendment concepts of due process, it is nonetheless accepted that "discrimination may be so unjustifiable as to be violative of due process." Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). The danger of unjustifiable discrimination against aliens is nowhere greater than in the enactment of social benefit programs like Medicare, where their complete lack of representation in the political process may result in the purposeful or inadvertent exclusion of aliens from benefits. It is in this sense that "[a]liens as a class are a prime example of a 'discrete and insular' minority." Graham v. Richardson, 403 U.S. at 372, 91 S.Ct. at 1852. We therefore conclude that the fifth amendment can here be said to contain the same "pledge of the protection of equal laws," Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886), as is evident from the fourteenth amendment. *Cf.* Richardson v. Belcher, 404 U.S. at 81, 92 S.Ct. at 254.

■■ A statutory classification accords with fundamental equal protection and due process notions only if, as recent decisions employing the rational basis test have acknowledged, it is both "rationally based *and free from invidious discrimination.*" Dandridge v. Williams, 397 U.S. at 487, 90 S.Ct. at 1162, quoted in Richardson v. Belcher, 404 U.S. at 81, 92 S.Ct. at 257 (emphasis added); *cf.* Jefferson v. Hackney, 406 U.S. at 547, 92 S.Ct. at 1731–1732. Invidious discrimination may appear in either an impermissible statutory purpose, *see* Gomillion v. Lightfoot, 364 U.S. 339, 341, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960); Yick Wo v. Hopkins, *supra,* or in the choice of a classification that is impermissibly discriminatory as applied to achieve a valid legislative purpose. *Cf.* Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1949); Korematsu v. United States, *supra.* Because alienage is a classification "in-

herently suspect and . . . therefore subject to strict judicial scrutiny," Graham v. Richardson, 403 U.S. at 376, 91 S.Ct. at 1854, we think the rational basis standard requires no less than such a twofold analysis of the provisions challenged here.[10] Whether the compelling interest standard should be applied instead need not be decided in view of our holding, for the reasons which follow, that the alien eligibility provision cannot meet even the requirements of the rational basis test.

## ARGUMENT

Plaintiff contends that the entirety of the alien eligibility provision for supplemental medical benefits violates due process. For the sake of convenience, we turn our attention first to the five-year continuous residency aspect of 42 U.S.C. § 1395o(2)(A)(ii) (1970). Defendant has advanced two legislative purposes which he asserts are valid of themselves and bear a rational relationship to this durational residency condition: (1) that the residency requirement is essential to the continuing fiscal integrity of the supplemental benefits program; and (2) that it is necessary to prevent certain aliens, such as short-term visitors, from obtaining benefits.

### A. *Fiscal Integrity*

■ We do not doubt that a desire to insure the continued fiscal integrity of the supplemental benefits program is itself a valid governmental purpose. *Cf.* Shapiro v. Thompson, 394 U.S. at 633, 89 S.Ct. at 1330. But the facts do not support defendant's conclusion that the residency requirement either was intended to serve, or does serve, that objective.

If, in fact, Congress intended to protect the fiscal integrity of the program by attaching a residency requirement for alien eligibility, the legislative history of the provision is singularly casual about such a concern. The House-passed bill contained no durational residency

requirement at all for alien participation in the supplemental benefits program. H.Rep.No.682, 89th Cong., 1st Sess. 39 (1965), *in* 111 Cong.Rec. 18371 (1965); U.S.Code Cong. & Admin.News, 2233–34 (1965). Although the Senate version added a 10-year residency provision, 111 Cong.Rec. 15609, 15613 (1965), a conference committee compromise reduced it to the present five-year term. H.Rep. No.682, *supra* at 39–40. It is therefore difficult to conclude that Congress considered the durational residency requirement for aliens an element particularly important to the fiscal integrity of the supplemental medical insurance program.

The government nonetheless argues that the alien residency requirement is necessary to permit the supplemental benefits program to become increasingly self-supporting. Whereas this purpose may be apparent in the hospital insurance program created by Medicare, 42 U.S.C. § 426a (1970); S.Rep.No.404, 89th Cong., 1st Sess., pt. 1 at 66–70 (1965), *in* U.S.Code Cong. & Admin. News, 2007–11 (1965), it is not true of Medicare's supplemental medical insurance program.

■ The Federal Supplementary Medical Insurance Trust Fund created by the 1965 Medicare Amendments derives one-half of its income at all times from appropriations of the general revenues of the United States. 42 U.S.C. § 1395w (1970). The remaining half is supplied by monthly premium payments from eligible individuals who choose to enroll in the program. 42 U.S.C. § 1395r(b)(2) (1970). Moreover, unlike the hospital insurance system, the supplemental benefits program was intended by Congress to run on a "current cost" financing basis, and to be equally funded by general revenue contributions and adjustable premiums. S.Rep.No. 404, *supra*. Thus, the only discernible means by which the trust fund might become increasingly self-supporting is through adequate appreciation of its in-

---

10. *See* Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1077–87 (1969).

vestments to permit decreases not only in premium payments but also in general revenue contributions. We can therefore find no evidence that the alien residency requirement is either necessary or rationally related to the asserted purpose of maintaining, much less improving, the fiscal position of the supplemental medical insurance program.

▆ Nor can defendant argue that Congress may validly exclude retirement-age aliens from participation in the supplemental benefits program simply because their inclusion would require additional federal revenue contributions to the trust fund. Regardless of whether they have ever in their lives paid federal taxes, retired indigent citizens who receive state public assistance benefits are eligible for the supplemental medical insurance program, *see* 42 U.S.C. § 1395s(f, i) (1970), and the general revenues provide half the cost of their benefits. Moreover, federal tax revenues are still further depleted on behalf of retired indigent citizens to the extent that the supplemental program's monthly premiums due from them may be paid by state public assistance programs, 42 U.S.C. § 1395v(d)(1) (1970), which are funded in substantial part by the federal government. 42 U.S.C. § 1396b(a)(1) (1970). But the five-year residency requirement operates to exclude retirement-age aliens, whether indigent or not, from these same benefits, despite the fact that those among them who are indigent may not be barred from state public assistance programs on the basis of durational state residency requirements. Machado v. Department of Health & Rehab. Serv., 357 F.Supp. 890 (S.D.Fla.1973) (three-judge court); Zarate v. Department of Health & Rehab. Serv., 347 F.Supp. 1004 (S.D.Fla. 1971) (three-judge court); *cf.* Graham v. Richardson, *supra*; 42 U.S.C. § 1396a(a)(10)(II) (1970).

▆ If it was the Congressional purpose to preserve the general federal revenues from depletion by excluding aliens alone through the residency requirement, that classification results in a discrimination which can only be termed invidious. The general revenues used to pay supplemental benefits to retired indigent citizens come from taxes imposed on all non-indigents in the United States, and it must not be forgotten that "[a]liens, like citizens pay taxes." Graham v. Richardson, 403 U.S. at 376, 91 S.Ct. at 1854. Federal taxes paid by aliens therefore underwrite the very supplemental benefits for retired indigent citizens which Congress has made unavailable to members of plaintiffs' class. To the extent that aliens, but not citizens, are deprived of supplemental benefits by the durational residency requirement, the classification discriminates invidiously against them.[11] If Congress may choose to underwrite a major part of the medical expenses of retired indigent citizens with funds from the public treasury, it may not constitutionally do so on the basis of a classification which works an exclusion from benefits of similarly situated aliens. Shapiro v. Thompson, 394 U.S. at 633 & n. 11, 89 S.Ct. at 1330.

▆ In addition, we must question the basic rationality of attempting to achieve cost economies in the supplemen-

---

11. As of November 1972, Cuban Refugee Center statistics showed that 446,387 Cuban refugees had arrived in the United States since January 1961. Cuban Refugee Program, Weekly Statistical Report, pt. A (Nov. 17, 1972), Plaintiffs' Memorandum for Summary Judgment, Exhibit A. Of these, 159,643 arrived between February 2, 1968, and October 30, 1972, during which period 12,730 or 8 percent were age 65 or over upon arrival. *Compare* Cuban Refugee Program, Consolidated Report of Overall Operation (Oct. 1972), Plaintiffs' Memorandum for Summary Judgment, Exhibit C2, *with* Cuban Refugee Program, Consolidated Report of Overall Operation (Jan. 1968), Plaintiffs' Memorandum for Summary Judgment, Exhibit B2. Although this sample is inadequate as a basis for more detailed projections, it does not appear that the number of Cuban refugees whose age would otherwise qualify them for supplemental medical insurance benefits is disproportionately large in comparison with the number of potential new taxpayers.

tal medical benefits program by means of a residency requirement having the necessary effect that this one now has on members of plaintiffs' class. Because it simply serves to postpone their eligibility for supplemental medical benefits, we think it not improbable that those who desire and need such benefits will defer, insofar as humanly possible, all covered medical expenses until such time as they meet the eligibility requirements. The net result can only be higher benefits claims for each such individual when he becomes eligible, given a five-year period of minimal medical care with its attendant frustration of the economies of preventive medicine. Thus, the residency requirement appears more likely to increase, rather than decrease, the costs of the supplemental medical insurance program, unless the rather morbid presumption is indulged that mortality among members of the class prior to the time that they become eligible will more than offset such increases.

### B. *Undeserving Aliens*

The government suggests, secondly, that Congress may validly seek to exclude entirely certain aliens from receiving supplemental medical insurance benefits. Specifically, defendant asserts that Congress may rationally bar from the program aliens visiting or residing in the United States temporarily, aliens who enter solely to obtain medical treatment, and aliens who are residing illegally in the United States. We assume, without deciding, that such a purpose is a proper one. *But see* Shapiro v. Thompson, 394 U.S. at 631, 89 S.Ct. at 1329.

■ We think the alien residency requirement constitutes an overly inclusive classification to accomplish any of these purposes. Although a five-year period may be long enough effectively to exclude most short-term alien visitors or residents, it will not exclude those maintaining their domicile abroad but who, like ambassadors, foreign correspondents and other professionals, may be required by their occupation to reside in the United States for longer periods of time. Even aliens entering the country for medical treatment will not necessarily be excluded by the alien residency requirement if the treatment they seek demands such prolonged care and observation as may be necessary for cancer and other major diseases. Likewise, if the five-year residency test contributes at all to the apprehension and exclusion from benefits of aliens residing here illegally, a shorter residency period should perform the same functions even better. The durational residency provision "enact[s] what in effect are non-rebuttable presumptions that every [alien] applicant for assistance" came to the United States for a disqualifying purpose. Shapiro v. Thompson, 394 U.S. at 631, 89 S.Ct. at 1330. To utilize the alien residency requirement to serve these purposes is therefore to use a particularly blunt instrument for a surgical task.

■ In evaluating the impact of this implement on plaintiffs' class, we cannot ignore the fact that its design was, as we have noted, the product of compromise. Perhaps the only consistent result of that compromise is to exclude immigrant aliens from supplemental medical benefits until such time as they are eligible for citizenship and, as citizens, for benefits.[12] The fact that the compro-

---

12. Five years of continuous residence are also required for eligibility for naturalization. 8 U.S.C. § 1427(a)(1) (1970); *see* note 21 *infra*. Naturalized citizens are, of course, eligible for supplemental medical insurance benefits upon the sole condition that they attain the age of 65. 42 U.S.C. § 1395o(1) and (2)(A)(i) (1970). Although naturalization requires permanent residence status in addition to five years of residency, adjustments to permanent residence status retroactive to the date of arrival can be obtained by plaintiffs and members of the class they represent, a process which takes less than five years in the case of Cuban parolees. *See* note 6 *supra*.

mise residency requirement corresponds to the waiting term for naturalization cuts against, not in favor of its constitutionality as a tool for barring a limited number of aliens from benefits. If some aliens may legitimately be excluded from the supplemental medical benefits program, as we have assumed, the use of a classification so overbroad that it excludes almost all aliens *qua* aliens is invidiously discriminatory, if it is not arbitrary and without rational basis. *Cf.* Hirabayashi v. United States, *supra*; Korematsu v. United States, *supra*.

### C. *Other Justifications*

Shapiro v. Thompson suggests other possible legislative purposes which might justify the alien residency requirement, although defendant has not urged them upon us. They merit consideration because the courts, in applying the rational basis standard, have attributed to the legislature any reasonably conceivable purpose which would support the constitutionality of the classification.[13] It could be argued here, as it was in *Shapiro*, that the residency requirement "(1) facilitates the planning of the welfare budget; (2) provides an objective test of residency; (3) minimizes the opportunity for recipients fraudulently to receive payments from more than one jurisdiction; and (4) encourages [the] early entry of new residents into the labor force." 394 U.S. at 634, 89 S.Ct. at 1331.

■ The fact that no residency requirement for eligibility is placed on citizens belies any attempt to justify it as essential for planning either general revenue or trust fund budgets, especially since long-term projections are unnecessary given the program's funding on a "current cost" basis. Nor can the five-year delay in eligibility be rationalized

as an objective test of residency in light of the provision's twin requirement of permanent residence status which, however it may constitutionally be defined, provides just such a test. Lastly, it suffices to note that the possibility of fraudulent receipt of benefits from more than one jurisdiction is here inoperative, as is any legislative purpose to encourage the entry of retirement-age aliens into the labor force. For these reasons we must conclude that the classification created by application of the residency requirement to aliens, but not to citizens, is invidiously discriminatory as a means to accomplish these arguably valid legislative purposes.

Defendant has advanced no other theory to justify the durational residency requirement, and we can conceive of none. We therefore decide that the five-year residency requirement for alien eligibility for supplemental medical insurance benefits violates equal protection notions inherent in fifth amendment due process. To grant relief to plaintiff Espinosa and the sub-class of those with permanent residence status which he represents, we need continue no further.

### SEPARABILITY

■ Yet plaintiffs Dias and Clara urge on behalf of the class herein certified that we proceed to examine the constitutionality of the requirement of permanent residence status. We have no occasion to consider this second aspect of the alien eligibility provision, however, because its permanent residence language cannot, in our view, be severed from the durational residency requirement.[14]

The very wording of the twin residency requirements suggests that Congress may not have intended that they be

13. *Developments in the Law—Equal Protection,* 82 Harv.L.Rev. 1065, 1078 (1969).

14. Although for this reason we need not consider Asensio v. Richardson, Civil No. 71–1446, [1972 Transfer Binder] CCH Medicare & Medicaid Guide ¶ 26,475, at 10,242–44 (S.D.Fla. May 2, 1972), we note that our decision here is not inconsistent with that case because the ruling there concerned a deported nonimmigrant who had no reasonable expectation of remaining in the United States for other than a "temporary period of time." *Id.* at 10,244; *see* note 5 *supra*.

**14**

separable.[15] Moreover, the legislative history of the alien eligibility provision for supplemental medical insurance is devoid of evidence of Congressional intent to treat its twin requirements as severable ones.[16] Nor is guidance provided by the history of any other provision of the 1965 Amendments.[17] If similar requirements in subsequent laws are not uninstructive,[18] no prior social benefit legislation contains such a provision.[19] And even though administrative practice may sometimes be persuasive evidence of legislative intent, e. g., Griggs

15. If the phrases were linked by a conjunction such as "and" or "or," rather than by the relative pronoun "who," we would be less hesitant than we are to conclude that Congress intended them to be separable.

16. Although Section 1836 of H.R. 6675 contained no durational residency requirement when initially considered and passed by the House on April 8, 1965, 111 Cong. Rec. 7444 (1965), such a provision was an integral part of the bill which received Senate approval. However, no clear manifestation of Congressional intent about separability is evident in the report of the Senate Finance Committee where, in closed session, the alien eligibility language of H.R. 6675 attained its present form. S.Rep.No.404, 89th Cong., 1st Sess., pt. 2 at 483 (1965), in Senate Reports, Miscellaneous Reports on Public Bills III (GPO 1965). Although the alien eligibility provision is once paraphrased disjunctively in the explanatory section of the Senate report, S.Rep.No.404, 89th Cong., 1st Sess., pt. 1 at 70 (1965), in U.S.Code Cong. & Admin.News, 2011 (1965), that document elsewhere consistently traces the exact language of the amended provision. S.Rep.No.404, pt. 1, supra at 39, 170, in U.S.Code Cong. & Admin.News, supra at 1980, 2109. No instructive discussion of severability occurred on the Senate floor because the eligibility provision was submitted as one of several technical amendments at the start of debate, 111 Cong.Rec. 15613 (1965), and was accepted without separate consideration. 111 Cong.Rec. 15609 (1965).

17. Although Section 103(a)(4) of H.R. 6675 contained, in its final form, an identical alien eligibility provision for the Medicare hospital insurance plan, its legislative history is no more illuminating on the separability question. As it initially passed the House, that provision contained a 10-year residency requirement, but no permanent residence component. H.Rep.No.682, 89th Cong., 1st Sess. 39 (1965), in 111 Cong.Rec. 18371 (1965); U.S.Code Cong. & Admin.News 2233 (1965). The permanent residence language first appeared after amendment of H.R. 6675 by the Senate Finance Committee in closed session. S.Rep.No.404, 89th Cong., 1st Sess., pt. 1 at 194 (1965), in U.S.Code Cong. & Admin.News 2134 (1965). Despite a paraphrase in disjunctive form in the Senate report, S. Rep.No.404, pt. 1, supra at 25, in U.S. Code Cong. & Admin.News, supra at 1961, the explanatory material more often follows the exact language of the amended provision. S.Rep.No.404, pt. 1, supra at 69, 194, in U.S.Code Cong. & Admin. News, supra at 2007, 2134 (1965).

18. See 42 U.S.C. § 1382c(a)(1)(B)(ii) (Supp. II, 1973); 42 U.S.C. § 428(a)(3) (B) (1970). We think it significant that the most recent expression of the will of Congress on eligibility for social benefits makes special provision for parolees and conditional entrants to insure their inclusion as individuals eligible for aid to the aged, blind and disabled. This eligibility test abandons the durational residency requirement for aliens, and its permanent residence provision contains a new exception. Benefits are made available to an otherwise qualified individual who is: "either (i) a citizen or (ii) an alien lawfully admitted for permanent residence or otherwise *permanently residing in the United States under color of law* (including any alien who is lawfully present in the United States as a result of the application of the provisions of section 203(a)(7) [conditional entry] or section 212(d)(5) [parole] of the Immigration and Nationality Act). 42 U.S.C. § 1382c(a)(1)(B) (Supp. II, 1973) (emphasis added).

19. A key word computer search of all but Title 8 of the 1970 edition of the *United States Code* which focused on the terms "alien" and "eligible" and varients thereon failed to reveal the existence of any pre-1965 legislative provision then in force that links permanent residence and durational residency elements. *But cf.* 8 U.S.C. § 1427(a) (1970). The court acknowledges with appreciation the help in resolving this question provided by the Office of Computer Services in the Administrative Division of the Department of Justice, and of JURIS, the Justice Retrieval and Inquiry System.

v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971), it is of little assistance here.[20]

The most reliable indication of Congressional intent appears in the report of the House delegation to the conference committee, which reveals that unification of the two residency elements was an integral part of the larger compromise necessary to the final passage of the 1965 Medicare Amendments.[21] Although we recognize that reasonable

---

20. The Social Security Administration, charged with implementing the Medicare programs, has issued an interpretation of the alien eligibility requirement which leaves the separability issue in doubt:

"An individual who is age 65 or over is eligible for enrollment in the supplementary medical insurance plan   .   .   . if:

\*          \*          \*          \*          \*

"(c) He is an alien lawfully admitted for permanent residence, *who* is a resident of the United States *and who* has resided in the United States continuously during the 5 years immediately preceding the month in which he applies for enrollment."

20 C.F.R. § 405.206 (Supp.1972). It may be that in practice some applications for enrollment are rejected solely for failure to meet one part of the residency requirement or the other, *see* note 6 *supra*, as were those of plaintiffs Diaz and Clara for inadequate length of residence. Their rejection notices, which followed what appears to be a standard format, stated:

"*You* are not entitled to health insurance protection under the Social Security Act because you are not a United States citizen and have not resided in the U.S. for a required period of time. *A person* not entitled to social security benefit or railroad retirement annuity must be a citizen or must have been admitted to the United States for permanent residence and have actually resided in the U.S. for 5 years immediately before the month he filed for health insurance." (Emphasis added.)

We think such evidence of administrative interpretation too inconclusive to be entitled to great deference.

21. The legislative history of the alien eligibility provision as finally enacted demonstrates that it was a product of compromise. Neither House simply "receded" before the wishes of the other. The report submitted to the House on H.R. 6675 by that Chamber's conferees indicates that the differences between the two Houses over the alien eligibility provision in Section 1836 of the bill for the part B supplemental medical insurance plan were not considered in isolation, but jointly with like disagreements over the eligibility provision for the part A hospital insurance plan in Section 103(a)(4). H.Rep. No.682, 89th Cong., 1st Sess. 39–40 (1965), *in* 111 Cong.Rec. 18371 (1965); U.S.Code Cong. & Admin.News 2233–34 (1965). The House bill initially contained only a requirement of permanent residence status for part B, and only a 10-year residency provision for part A. The Senate incorporated a 10-year residency provision into part B, and a requirement of permanent residence status into part A, while shortening the original 10-year residency provision of part A to six months. The conference committee compromise package integrated the permanent residence requirement with a five-year residency provision, and imposed the resulting unified eligibility requirement on both the part A hospital insurance and part B supplemental medical insurance plans.

It may well be, as the government suggests, that the terms of the compromise were adapted from the residence requirement for naturalization contained in Section 316(a) of the Immigration and Nationality Act of 1952, which provides in pertinent part:

"No person   .   .   . shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totalling at least half of that time   .   .   .   . "

8 U.S.C. § 1427(a) (1970). Yet if this not unlikely hypothesis could be confirmed, the fact that the twin elements of the supplemental insurance plan's eligibility provision were both borrowed from the naturalization statute would, of itself, provide weighty evidence that Congress did not intend them to be separable. Perhaps more persuasive evidence for the same conclusion is provided by the difficulties that would be inherent in rescuing the permanent residence language of § 316(a) if its five-year residency provision were stricken. But whatever the case, pragmatic compromise or adaptation, the evidence points to the conclusion that Congress intended no separability of the

men might differ on this question, we think the closely interwoven compromise language of the eligibility requirement's twin residency aspects rebuts any lingering presumption of separability from the general savings clause of the Social Security Act,[22] and that the entire provision must stand or fall as an entity.[23]

## CONCLUSION

On the basis of the foregoing findings of fact and conclusions of law, we hold the entirety of the alien eligibility requirement of 42 U.S.C. § 1395o(2)(A)(ii) (1970) unconstitutional as a denial of fifth amendment due process. We therefore permanently enjoin the defendant Secretary from this day forward from relying on that provision

to deny enrollment in the Medicare supplemental insurance plan, 42 U.S.C. § 1395j et seq. (1970), not only to plaintiff Espinosa and the sub-class he represents, but also to plaintiffs Diaz and Clara and the class herein certified.

The fact that it was unnecessary to reach the issue posed by the permanent residence requirement does not mean that we entertain no doubts about its constitutionality. Although the phrase may appear on its face to be a legitimate extension of the Congressional power to regulate entry into the United States, in actuality it may simply duplicate the immigration laws which screen out potential immigrants likely to become public charges.[24] Moreover, if its

---

twin requirements of the alien eligibility provision.

22. Section 1103 of the Social Security Act of 1935 provides:

"If any provision of this chapter, or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby."

42 U.S.C. § 1303 (1970).

23. The touchstone of separability is, of course, Congressional intent. For this reason, the Supreme Court recently observed:

"[W]hatever relevance such an explicit [severability] clause might have in creating a presumption of severability, the ultimate determination of severability will rarely turn on the presence or absence of such a clause."

United States v. Jackson, 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218, 20 L.Ed. 2d 138 (1968) (citations omitted). We have serious doubts, for the reasons stated, that Congress would have enacted the permanent residence language by itself, and we are not without reservations about the constitutionality of that aspect of the residency requirement. Particularly in view of the possibility that Congress adapted the alien eligibility provision from the prerequisites for naturalization, see note 21 supra, we think it evident that the twin requirements are not sufficiently independent that "the invalid part may be dropped [because] what is left is fully operative as a law." Id. at 585, 88 S.Ct. at 1218, quoting Champlin Rfg. Co. v. Corporation Comm'n, 286

U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932).

24. For a brief summary of the provisions of the Immigration and Nationality Act which operate to exclude and remove immigrant aliens likely to become, or who do become, public charges, see Graham v. Richardson, 403 U.S. 365, 377, 91 S.Ct. 1848, 1855, 29 L.Ed.2d 534 (1971). These provisions apply not only to immigrants, but also to nonimmigrants, unless waived by the Attorney General. 8 U.S.C. §§ 1182(a), 1184(a) (1970); 8 C.F.R. § 214.1(a) (Supp.1973). Although parolees and conditional entrants may arrive in the United States without first meeting these self-support admission standards, 8 U.S.C. §§ 1153(a)(7), 1182(d)(5) (1970); 8 C.F.R. § 212.5(a) (Supp.1973), parole is subject to revocation at any time at the Attorney General's discretion. Parolees who seek adjustments of status to that of permanent residence either to obtain greater security or to become eligible for naturalization must meet the standard admission requirements, including those of financial self-support. Act of Nov. 2, 1966, Pub.L.No.89–732, § 1, 80 Stat. 1161, in 8 U.S.C. § 1255 note (1970); 8 U.S.C. §§ 1182(a), 1255(a) (1970). It is mandatory that conditional entrants who have not acquired permanent residence status after residing in the United States for two years be examined to determine whether they meet the financial requirements for admission or must be deported. 8 U.S.C. § 1153(g) (1970). Likewise, nonimmigrants who seek adjustments of status to that of permanent residence must meet the prerequisites for admission, including those of self-support. 8 U.S.C. § 1255(a) (1970).

efficacy as a deterrent is subject to question, so too is the rationality of its scope as a means to achieve the legislative purposes the government has here advanced in defense of the entire alien eligibility provision.

Neither can we ignore the fact that to uphold the requirement of permanent residence status would be to work a fundamental injustice in that a major part of the relief contemplated by this decision would thereby be rendered a nullity. Plaintiffs Diaz and Clara and the not insubstantial class they represent would be barred from eligibility for supplemental medical benefits for all but about a year prior to becoming eligible for benefits as citizens.[25]

America once held her arms open wide, beckoning other lands to "[g]ive me your tired, your poor, your huddled masses yearning to breathe free, the wretched refuse of your teeming shores . . . ."[26] Although it may be, as some cynics have remarked, that this is exactly what she got, to the extent our nation continues to hold out a promise of refuge to victims of political and natural misfortune, the Constitution requires that we accept them to reside here on an equal basis with citizens.

25.  *See* notes 6 & 21 *supra*.

26.  E. Lazarus, "The New Colossus" (1883).