James **NEWKIRK** and Cornelius Lucas, Plaintiffs,

v.

Harold N. **BUTLER,** Superintendent of **Wallkill Correctional Facility,** and Russell G. Oswald, **Commissioner** of Correctional Services of the State of New York, **Defendants.**

No. 72 Civ. 2851.

United States District Court,
S. D. New York.

Oct. 9, 1973.

William E. Hellerstein, Daniel Pochoda, Marjorie Mazen Smith, New York City, for plaintiffs The Legal Aid Society Prisoners' Rights Project.

Lynn J. Walker, New York City, for plaintiffs NAACP Legal Defense and Ed. Fund, Inc.

Louis J. Lefkowitz, Atty. Gen., of N. Y., New York City, for defendants; Hillel Hoffman, New York City, of counsel.

ROBERT J. WARD, District Judge.

This is an action brought under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983, seeking declaratory and injunctive relief against alleged unconstitutional punishment. The four original plaintiffs were inmates of Wallkill Correctional Facility ("Wallkill"), a medium security prison, serving sentences of imprisonment imposed by New York State courts. The were transferred from that institution to two maximum security institutions (plaintiffs Newkirk and Lucas to Clinton Correctional Facility, plaintiffs Oliver and Rodriguez to Auburn Correctional Facility) on June 8, 1972 by the orders of and under the authority of defendants Harold N. Butler, Superintendent of Wallkill, and Russell G. Oswald, Commissioner of Correctional Services of the State of New York.

The gravamen of the complaint is alleged imposition of punishment without due process of law, and solely for exercise of First and Sixth Amendment rights. The relief requested is a declaration that defendants had violated plaintiffs' constitutional rights, and an injunction ordering their return to Wallkill, expunging all record of their transfer, and prohibiting future transfers without a due process hearing.

Prior to the commencement of the trial, two of the plaintiffs, Oliver and Rodriguez, were released and the complaint was dismissed insofar as it related to them. Following the trial, plaintiff Lucas was released and the action is dismissed as to him as well. The action continues as to plaintiff Newkirk.

The transfers followed several weeks of activity during which plaintiffs had circulated for inmate signatures petitions to form a union at Wallkill. Obtaining the requisite number of inmate signatures was to be the first step in a process of gaining official recognition as a collective bargaining unit. This effort generated some vociferous controversy among the prisoners but was never forbidden or even actively discouraged by the prison officials, although they did watch closely and monitor the level of unrest within the prison. Tension among the inmates stemmed in part from the unwillingness of the existing prisoner representatives to support the petitions, and the consequent fear among other inmates that the authorities also opposed the efforts to unionize and that there would be reprisals against those who signed the petitions. The verbal controversy apparently peaked on June 2, 1972, with a general meeting at which the petitions were discussed in loud voices. The meeting dispersed peacefully and there were no incidents of violence or threats of violence. On June 8, after several days of apparent calm, the plaintiffs were summoned to the infirmary and informed that they were being transferred immediately. They were not told why or given any opportunity to contest the transfers.

The institutions to which the plaintiffs were transferred are maximum security institutions, and the conditions there contrast strikingly with those in Wallkill, a medium security institution. The cells are locked, the guards armed, the access to library and recreational facilities more limited, the space more crowded, and the rehabilitation programs significantly less extensive. The prisons are at a greater distance from New York City where these prisoners' families live, and visiting is therefore restricted; the use of the telephone to communicate with family is also limited. Additionally, the fact of transfer itself involved some hardships: the prisoners were kept for various times in segregation "for screening purposes" and were unemployed (on "idle" status) pending reassignment to work. Their eventual new jobs paid less than those they had performed at Wallkill.

Trial was accelerated in lieu of preliminary relief. After all the witnesses were heard, but before a decision was rendered, defendants represented that the remaining two plaintiffs were being returned to Wallkill. Counsel expressed the hope that the parties could stipulate to a consent order resolving the controversy, and decision was reserved. The settlement negotiations having broken down, defendants moved to dismiss the complaint as moot, since plaintiffs were no longer in the complained-of maximum security prisons, and three of the four plaintiffs had been released on parole. Plaintiff Newkirk opposes that motion, contending that the practices of defendants place him and other inmates under continuing fear of summary reprisal for the exercise of their First and Sixth Amendment rights.

For the reasons discussed below, the prayer for declaratory relief is granted, the prayer for an injunction ordering the return of the prisoners to Wallkill is dismissed as moot, and the prayer for an injunction against future summary transfers is dismissed because in the present posture of the case there is not a sufficiently delineated controversy to merit its adjudication.

Newkirk contends that the action of defendants amounted to the imposition of significant punishment without due process of law, and solely for the exercise of his First and Sixth Amendment rights. Defendants reply that the transfers were an administrative, not a disciplinary, act, that therefore their discretion must remain unfettered, and that prisoners are not entitled to a due proc-

ess hearing prior to transfer. They maintain, moreover, that if the activity of plaintiff was protected under the First and Sixth Amendments, there was sufficient justification in the urgency of the situation to merit their action. The issues raised are of such scope that a preliminary discussion of the applicable law is appropriate.

It can no longer be questioned that prisoners, while forfeiting, as a necessary corollary of prison life, significant rights and privileges enjoyed by the general populace, retain those basic rights which are not incompatible with the running of the penal institution.[1] Many cases in recent years have delineated the precise scope of these protections. Among those rights of prisoners which the courts will protect with special solicitude are the First Amendment right to hold and to express beliefs and to receive information, the Sixth Amendment right of access to the courts, and the Eighth Amendment right of freedom from cruel and unusual punishment, that is, from deprivation of the most basic human needs.[2] Any punishment imposed which infringes on these rights is examined with the strictest scrutiny, and the state must justify its acts by demonstrating the most pressing necessity. As Judge Weinfeld expressed the standard in Fortune Society v. McGinnis, 319 F.Supp. 901 at 904 (S.D.N.Y.1970), the state must show " . . . a compelling state interest centering about prison security, or a clear and present danger of a breach of prison security, or some substantial interference with orderly institutional administration." These rights are not absolute, nor even as extensive as those enjoyed by the general populace; the prison authorities remain free to regulate, for example, the manner of speech and the time and place of access to legal resources, to the extent justified by the true exigencies of maintaining prison discipline.[3] But the regulation must not be such as to abrogate the right, nor more restrictive than justified by the need for discipline.

Outside this area of constitutionally protected rights lies the realm of "day-to-day prison discipline" or administration in which courts and particularly federal courts are traditionally reluctant to interfere. The state and the prison authorities are free, in this area, to prescribe rules and discipline for infractions, with wide discretion and without the close scrutiny described above.[4]

In this realm, however, the courts have articulated the right of prisoners to be free from the arbitrary imposition of sanctions, even when basic rights are not infringed upon. Thus, the Court of Appeals for the Second Circuit in Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971), while rejecting the lower court's formulation of elaborate guarantees, stated, "We are not to be understood as disapproving the judg-

---

1. *See*, Price v. Johnston, 334 U.S. 266, 68 S. Ct. 1049, 92 L.Ed. 1356 (1948); Sostre v. McGinnis, 334 F.2d 906, 908 (2d Cir. 1964), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); Fortune Society v. McGinnis, 319 F.Supp. 901, 904 (S.D.N.Y. 1970); Carothers v. Follette, 314 F.Supp. 1014, 1023–1024 (S.D.N.Y.1970).
In Sobell v. Reed, 327 F.Supp. 1294 (S.D.N.Y.1971), Judge Frankel of this Court stated: "Whatever may once have been the case, it is not doubtful now that the Constitution, and notably the First Amendment, reaches inside prison walls. The freedoms of conscience, of thought and expression, like all the rest of life, are cramped and diluted for the inmate. But they exist to the fullest extent consistent with prison discipline, security and 'the punitive regimen of a prison. . . .'" at 1303.

2. Pierce v. LaVallee, 293 F.2d 233, 235 (2d Cir. 1961); Fortune Society v. McGinnis, *supra* 327 F.Supp. at 904; Sobell v. Reed, *supra*; Goodwin v. Oswald, 462 F.2d 1237, 1241 (2d Cir. 1972) and cases cited at 1241, 1242.

3. *See, e. g.*, McCloskey v. State of Maryland, 337 F.2d 72 (4th Cir. 1964); Roberts v. Peppersack, 256 F.Supp. 415 (D.Md.1966); Sostre v. McGinnis, *supra*.

4. *See, e. g.*, McCloskey v. State of Maryland, *supra* 337 F.2d at 74.

ment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials . . .," and mandated a certain minimal due process before severe sanctions were imposed. And in Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970), Judge Mansfield said, "Although a prisoner does not possess all of the rights of an ordinary citizen he is still entitled to procedural due process commensurate with the practical problems faced in prison life . . ." at 1028. The amount of process which is "due" becomes the crucial question, decided by a balancing of the interest infringed upon against the needs of the prison system.

■ The classic statement of this balancing process was made in Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) and repeated by the court in *Sostre, supra.*

"[A]s a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a particular proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account."

363 U.S. at 442, 80 S.Ct. at 1515. These rules of fair play apply whether the interest of the prisoner is called a right or a privilege, and whether the action of the official is deemed disciplinary or administrative. For ultimately the end of all prison discipline is the proper administration of the prison.

"Rejection of the right-privilege distinction as a sterile form of words has likewise cast doubt upon the logical difference between deprivations constituting 'punishment' and those presented as techniques for the maintenance of 'control' or 'security'. Pre-

sumably the consequence of labeling a deprivation a matter of control is that it may be imposed without procedural preliminaries. The distinction is unpersuasive."

Landman v. Royster, 333 F.Supp. 621 at 645 (E.D.Va.1971).

Recent cases have enumerated the interests of inmates as well as the needs of the prison system. Landman v. Royster, *supra*, contained a particularly full discussion of the balance in the prison context. The opinion stated:

"The Court must identify and analyze the precise nature of the individual interest at stake and compare it with the purpose and function of the governmental body. . . . The disciplinary function fulfilled in the decision to place a man in solitary confinement, to deny good time credit, to 'padlock' him in his cell involuntarily, or to impose the substantial disabilities of maximum security confinement, adjudicates the question of a substantial deprivation or grievous injury. Whether cast in terms of a finding of unfitness to circulate in the general population or seen as a determination of guilt, the decision to place a man under greater than usual restraint is founded upon a finding of noncompliance with general prison standards. . . ."

(333 F.Supp. at 652.) It continued, "A proper consideration is the effect that the introduction of procedural safeguards may have on legitimate prison functions both within and without the ambit of discipline. . . .",

citing security, administrator's leeway and time, speedy handling of some infractions on the spot. (at 652.)

*See also, e. g., Sostre, supra; Carothers, supra;* Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971).

■ Throughout this balancing process, the touchstone is fundamental fairness: if the most elemental rules of fairness are violated, unwarranted by the exigencies of the situation, then the

requisite due process has not been accorded. This assessment of fundamental fairness begins at the most basic level. Prisoners are entitled to know what the rules are, what actions will be met with sanctions.[5] They are entitled to know the general range of sanctions that may be imposed for given offenses. They are entitled to know, before punishment is imposed, the charges against them, and to explain their behavior, before a relatively impartial tribunal.[6] If the situation is such that prompt action is essential, the proper hearing must follow as soon as practicable. This is not to say that a "full due process hearing" is required, but simply procedural safeguards appropriate to the prison setting and sufficient to ensure against arbitrary action or action based upon erroneous information.[7]

In this context, we turn now to the specific situation before us. We need not decide today whether circulating petitions for signatures as the first step toward obtaining official recognition of a union as a collective bargaining agent falls within the realm protected by the First and Sixth Amendments,[8] so that the rules and sanctions established by the authorities would be subject to the strict standard of scrutiny; it is thus also unnecessary to judge whether transfer to prevent circulation of the petitions was justified by the unrest caused. For it is apparent, on the facts before the court, that in the present situation, even treating this as an area fully within the discretion of the authorities to regulate, plaintiff's due process rights were violated at a basic level.

There were no explicit rules governing the conduct of these inmates; they were acting within what guidelines were made known to them. Communication among prisoners at Wallkill was not restricted; a room was provided for meetings; the authorities were fully aware that petitions for the union were being circulated for many days, before they transferred plaintiff. At no time was plaintiff requested not to circulate the petitions, nor was it officially indicated to him that this was a matter of concern to the authorities. A large element of the unrest in fact resulted from the fear of some of the signers of the petitions that there would be reprisals, but until the circulators of the petitions were transferred there was no official indication that the authorities objected. This court is unable to find that the situation represented so clear and present a danger to the security of the prison as to justify transfer without warning.

Moreover, it is quite evident that to be located at Wallkill is a status prized by inmates. The advantages of the facility over other correctional institutions are numerous. Whether it is deemed a right or a privilege, the interest in continuing to be situated there is sufficiently great that transfer in direct response to his activity deserves some sort of "due" process, at the very least the knowledge that it is a possibility.

It is also evident that the transfer procedure, while termed "administrative," is at Wallkill at least used for disciplinary purposes. The record shows that the arsenal of disciplinary

---

5. Landman v. Royster, 333 F.Supp. 621 (E. D.Va.1971),

> "The Court concludes, therefore, that the existence of some reasonably definite rule is a prerequisite to prison discipline of any substantial sort." (at 656)

6. "In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him . . . and afforded a reasonable opportunity to explain his actions." Sostre v. McGinnis, 442 F.2d at 198.

7. See the cases cited in *Sostre*, 442 F.2d at 198–199.

8. This issue was raised but not decided in Goodwin v. Oswald, 462 F.2d 1237 (2d Cir. 1972). In a concurring opinion Oakes, J. expressed the view that nothing in the constitutional or statutory law forbids such activity (at 1245) but the decision itself was based upon the well-established protection of inmates' correspondence with their attorneys.

measures available in other institutions is less complete at Wallkill: there are no rooms for segregation aside from two infirmary rooms; the cells themselves are not locked; it is not feasible to isolate one inmate for special sanctions. Thus, if an inmate is found to be disruptive of the general rehabilitative scheme of the prison the only alternative is to transfer him. And he can only be transferred to a higher security, less desirable, institution. This, combined with the high value placed by the inmates themselves on their assignment to Wallkill, makes this "administrative" tool also a powerful disciplinary device. The fact that it is also used for purely administrative reasons in some instances does not shield it from the requirements of due process (of whatever appropriate form) when it is used and perceived as a disciplinary device.

Thus, the court today holds that on the facts before it, defendants' use of the transfer procedure violated plaintiff's right to due process at the most fundamental level: plaintiff was not informed of the "rules of the game" nor of the possible sanctions for their violation, yet was subjected to significant loss when he "transgressed." It matters not that the authorities have the power to regulate the activities of the inmates in their discretion, or to transfer the inmates for a wide range of reasons; even notice of the charges and a hearing after the offense would not bring this situation within the parameters of the process that was due. The court also notes that in this circumstance transfer was as much a disciplinary measure as others for which an administrative hearing is provided in the prison rules.

Plaintiff has requested injunctive relief restraining defendants *in futuro* from imposition of any further punitive transfers of plaintiff from Wallkill to any other correctional facility without affording him his procedural due process rights, including but not limited to written notice of the charges, knowledge of the facts upon which the transfer was based, a hearing before an impartial tribunal and an opportunity to question and challenge this basis. He contends that he is under continuing fear of summary transfer for the exercise of his First and Sixth Amendment rights.

This court is not persuaded that the threat of transfer is sufficiently great at this time to justify granting the injunctive relief sought by plaintiff. In the context of the present case it is sufficient to require that the prison authorities make known to plaintiff the scope of permissible behavior and the circumstances which in their judgment would warrant transfer.

Plaintiff also requests an order to expunge all record of the transfer from his file. Since it has been represented to the court that an explanatory note has been included with the record of transfer, and that no action adverse to plaintiff, whether with reference to parole or discipline, will be based on this information, this request is also denied.

The foregoing constitutes the findings of fact and conclusions of law of the court for the purposes of Rule 52, Fed. R.Civ.P.

Settle judgment on notice.