John P. CROOM

v.

John MANSON, Commissioner, Department of Corrections, and Joseph Zizzamia.

Civ. No. H–163.

United States District Court,
D. Connecticut.

Nov. 14, 1973.

---

Richard Cramer, Legal Assistance to Prisoners, Hartford, Conn., for plaintiff.

Robert K. Killian, Atty. Gen., Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn., for defendant.

MEMORANDUM OF DECISION

BLUMENFELD, Chief Judge.

█ This is an action for declaratory and injunctive relief brought by a prisoner at the Connecticut Correctional Institution at Somers (hereinafter "Somers") pursuant to 28 U.S.C. §§ 1343(3) and 2201 and 42 U.S.C. § 1983.[1] Defendant Manson is the Commissioner of the Connecticut Department of Correction. Defendant Zizzamia is the supervisor of interstate transfer of prisoners for the Department of Correction. The defendants propose to transfer plaintiff from Somers to the Federal Correctional Institution at Marion, Illinois (hereinafter "Marion"). Plaintiff

---

1. Plaintiff's claims and the facts of this case demonstrate that this Court properly has jurisdiction. Gomes v. Travisono, 353 F.Supp. 457 (D.R.I.1973); Hoitt v. Vitek, 361 F. Supp. 1238 (D.N.H.1973); Ault v. Holmes, Civil No. 2399 (W.D.Ky. Aug. 23, 1973); Newkirk v. Butler, 364 F.Supp. 497 (S.D.N. Y.1973).

resists such transfer, claiming primarily that he has not been afforded the procedural due process constitutionally required before such transfer may be effected, and asserting that he may not be transferred until he has been afforded the process which he alleges is due.

## I.

### FACTS

John Croom is presently serving lengthy sentences at Somers following convictions for several major felonies, but his record of behavior "on the street" is far eclipsed by a history of violent behavior during incarceration that is as unsavory as it is notorious. In September, 1969, he stabbed five guards while undergoing an inspection at the Correctional Center in Bridgeport, critically injuring one of them. He was subsequently convicted of Escape with Violence and Assault with Intent to Kill. On October 21, 1971, he attempted to escape from Somers. On December 7, 1971, while in segregation at Somers, he splashed a correctional officer with a sulfur compound, burning the man's scalp and hair. When other officers attempted to restrain the plaintiff, he confronted them with a knife fashioned from a comb and a razor blade. On May 22, 1972, he attacked three officers with a baseball bat, seriously injuring two of them. For his part in this incident, he was again convicted of assault, and this time sentenced to imprisonment of not less than ten nor more than twenty years. He has also been guilty of numerous administrative violations while incarcerated at Somers, including spitting at correctional officers and possession of contraband. He has been in administrative segregation since the "baseball bat incident" on May 22, 1972.

Subsequent to the May 22 incident, defendant Zizzamia wrote to prison authorities in Maine, New Hampshire, Vermont, Rhode Island, and Massachusetts, seeking to transfer plaintiff to a correctional institution in one of those states. Due to already-existing overcrowding at some of the institutions, unrest among inmates at others, and the plaintiff's history of violent behavior, none of the states would accept plaintiff for transfer.[2]

Defendant Zizzamia testified at the hearing that he talked to plaintiff about transfer to a federal prison on September 5, 1973. When plaintiff inquired as to the specific prison, Zizzamia said, "I don't know." According to Zizzamia, plaintiff then said, "What difference does it make where I serve my time."

Arrangements were subsequently made to transfer plaintiff to Marion, pursuant to Conn.Gen.Stats. § 18–91.[3] On September 10, 1973, plaintiff was brought to a hearing room at Somers and told that he was being given a hearing on his nonvoluntary transfer to Marion. He was told that the transfer was scheduled for Thursday, September 13. He was offered the counsel of a lay advocate, but he refused the offer and asked for an attorney. This request was denied. He did not ask for more time to prepare a statement or to contest the transfer. He vigorously asserted that his constitutional rights were being violated and that he was being deprived of

**2.** Defendant Manson testified at the hearing that he rejected the possibility of transferring plaintiff from Somers to another correctional institution in Connecticut because he believed that, in view of plaintiff's history of violent behavior, no other institution in the state had adequate facilities for properly supervising plaintiff during incarceration.

**3.** Conn.Gen.Stats. § 18–91 provides, in pertinent part:

"The commissioner [of corrections] may enter into and execute a contract or contracts with the United States for the removal of any inmate from any institution of the department to a federal correctional institution or medical center when, in his opinion, the inmate needs particular treatment or special facilities available at such correctional institution or medical center, or it is in the best interest of the state."

access to his family and his attorney. He was told that the transfer was in his best interests inasmuch as it was the only way in which he could be released from administrative segregation and put into a general prison population. Following the hearing, plaintiff contacted his present counsel and sought declaratory and injunctive relief in this Court.

## II.

### PROCEDURAL DUE PROCESS

The minimum procedural requirements of the Due Process Clause were recently discussed in Hill Construction Company v. State of Connecticut, 737 F.Supp. 366 (D.Conn.1973):

> "The Due Process Clause of the Fourteenth Amendment provides procedural safeguards for the protection of certain interests. Thus due process requires notice and a hearing before persons are deprived of certain property interests, Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and in particular circumstances where interests ' "more precious . . . than property rights" ' are in issue, Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Constantinou v. Wisconsin, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

> "The Due Process Clause, however, does not require specific procedures every time private interests are alleged to be in jeopardy. ' "Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts.' Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960). Due process 'does not require a trial-type hearing in every conceivable case of government impairment of private interest.

> . . . The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy, 367 U.S. 886, 894–895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)."

■ It is clear that an individual's status as a prisoner does not remove him from the protections of the Constitution. As Judge (now Mr. Justice) Blackmun wrote in Jackson v. Bishop, 404 F.2d 571, 576 (8th Cir. 1968):

> "[A] prisoner of the state does not lose all his civil rights during and because of his incarceration. In particular, he continues to be protected by the due process and equal protection clauses which follow him through the prison doors. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941)."

Thus the initial inquiry is "whether due process requirements apply in the first place," Board of Regents v. Roth, 408 U.S. 564, 570–571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), i. e., whether the prisoner has been deprived of "liberty" or "property" protected by the Due Process Clause. Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The key to this determination is the definition of the ". . . precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy, *supra,* 367 U.S. at 895, 81 S.Ct. at 1748. If it is concluded that due process requirements apply, then the interests of the government and of the individual must be balanced in order to determine what process is due. Board of Regents v. Roth, *supra,* 408 U.S. at 570, 92 S.Ct. 2701.

■ With respect to the transfer of prisoners, the government has three in-

terests at stake: effective administration of the prison, "effect that the introduction of procedural safeguards may have on legitimate prison functions," Landman v. Royster, 333 F.Supp. 621, 652 (E.D.Va.1971), and, most important, rehabilitation of the prisoner. The first two of these interests might not argue strongly for affording prisoners procedural rights. The prison might conceivably be operated and maintained by administrative directive, but it seems likely that more would be lost in inmate resistance and resentment than would be gained in economy of time and resources. Similarly, the government might argue that requirements of notice and hearing have an unreasonably disruptive effect on prison operations, but that argument is undercut by the fact that, as in this case, notice and a hearing *are* presently given to prisoners prior to transfer.[4] On the issue of rehabilitation, however, the conclusion is clear: denying prisoners procedural protections, no less than denying them substantive rights, will engender resentment and hostility which will substantially interfere with their rehabilitation. As Chief Judge Pettine noted in Gomes v. Travisono, *supra*, 353 F.Supp. at 468:

> "While it appears that the state has, absent special circumstances, no interest in the summary transfer of inmates to prisons outside of Rhode Island, it does appear that the state has an interest in affording due process protections. See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The state has an interest in rehabilitating its prisoners so that, among other reasons, its citizens are spared the costs of further crime from these individuals. Certainly, the resentment felt by in-

mates who feel they have been transferred unjustly or without reason interferes with their rehabilitation. Involving the inmate in the decision to transfer will not decrease the discretion of prison officials, but will minimize the inmate's sense of resentment and will produce more appropriate, individualized results. In view of the detrimental effects transfer frequently has on an inmate's rehabilitative program, the state has an interest in assuring that the decision to transfer is correct. Finally, the state has an interest in determining that transfers are not made as punishment for the valid exercise of the constitutional rights or statutory rights of that class of its citizens who are incarcerated." (footnote omitted)

For his part, the prisoner obviously has several interests at stake, probably the most important of which are the two pressed by plaintiff here: deprivation of opportunity to have visits from his family, and lack of access to counsel and consequent impairment of ability to effectively appeal his convictions. Moreover, prisoners transferred from one institution to another are normally placed in administrative segregation upon arrival at the receiving institution.[5] Transfer may have a negative impact upon a prisoner's opportunities for parole and admission to rehabilitative opportunities.[6] Job programs and work training are interrupted by transfer.[7] And prisoners have been transferred for exercising rights protected by the Constitution.[8] The importance of these interests is clear beyond citation of authority: it is manifest that they are included within the scope of protection afforded by the Due Process Clause.[9]

4. Department of Corrections, State of Connecticut, Administrative Directive 4.12 (April 1, 1973).

5. *See* Hoitt v. Vitek, *supra*, at 1246 of 361 F.Supp.

6. Gomes v. Travisono, *supra*, 353 F.Supp. at 468.

7. Hoitt v. Vitek, *supra*, at 1248 of 361 F. Supp.

8. *See* Gomes v. Travisono, *supra*; Ault v. Holmes, *supra*; Hoitt v. Vitek, *supra*.

9. *Accord*, Gomes v. Travisono, *supra*; Capitan v. Cupp, 356 F.Supp. 302 (D.Or.1972); Park v. Thompson, 356 F.Supp. 783 (D.Hawaii

The determination that prisoners facing transfer to other institutions are entitled to due process, however, only launches the inquiry: the critical question is how much process such prisoners are due. In order to reach that determination, Roth v. Board of Regents, *supra*, directs us to balance the interests of the state against those of the prisoner. 408 U.S. at 570, 92 S.Ct. 2701.

■ We begin, as did the *Morrissey* Court, with the proposition that transfer of a prisoner is not part of a criminal prosecution and thus "the full panoply of rights due a defendant in such a proceeding" does not apply. 408 U.S. at 480, 92 S.Ct. at 2595. "Although a prisoner does not possess all of the rights of an ordinary citizen he is still entitled to procedural due process commensurate with the practical problems faced in

prison life." Carothers v. Follette, 314 F.Supp. 1014, 1028 (S.D.N.Y.1970).

Plaintiff cites several decisions from other jurisdictions in which courts have held that prisoners facing transfer must be afforded quite a substantial panoply of procedural rights. In Gomes v. Travisono, *supra*, the court ruled that a prisoner may not be transferred unless he is given written notice of the reasons for the transfer; an investigation of such reasons; an opportunity for administrative review of the charges against him; and a full hearing on the question of transfer before an impartial tribunal, including the right to respond to charges against him, to call and examine witnesses, and to have the assistance of a lay advocate. Further, a record of the proceeding must be kept, and the decision of the tribunal must be based on substantial evidence.[10] Similar conclu-

---

1973); Barrett v. Boone, Civil Action No. 73–81–C (D.Mass. January 26, 1973); Hoitt v. Vitek, *supra*; Ault v. Holmes, *supra;* Newkirk v. Butler, *supra*.

10. The procedural rights afforded prisoners facing transfer as more fully set out in the court's order in *Gomes* are the following:

"Defendants are enjoined from the involuntary transfer of any Rhode Island male prisoner, incarcerated pursuant to a judgment of conviction by Rhode Island courts, to a state or federal prison in another state, unless:

A. Prior to transfer (absent an emergency situation or compelling state interest), the inmate is given written notice of the charge or reasons for transfer; this charge or reason is investigated and reviewed by a superior officer; a hearing on the question of transfer is held before an impartial board; administrative review of the charge is available; and a record of the proceeding is kept. At the hearing the inmate must be read the charge and given the opportunity to respond, which opportunity shall include the right to call and examine witnesses and to have the assistance of a lay advocate. The decision to transfer must be based on substantial evidence.

In the event of an emergency situation resulting in transfer, the inmate must be returned to Rhode Island for the hearing and procedures outline[d]

above soon after the emergency has subsided; and

B. Periodic review is made of the status of the transferred inmate and whether he should be returned to Rhode Island. The Court suggests review every three months; and

C. Written regulations are promulgated which guarantee:
   a) the return of a transferred inmate to Rhode Island for all hearings before the parole board which will consider the subject of his parole;
   b) the return of a transferred inmate to Rhode Island for appearance in all court proceedings in Rhode Island in which he is involved; and
   c) the return of a transferred inmate to Rhode Island to confer with counsel in preparation for Rhode Island legal proceedings on affidavit of counsel that the presence of the inmate is necessary; and

D. Prior to transfer (absent an emergency or compelling state interest), an investigation is made of the treatment or rehabilitative programs available in the receiving institution, or, in the case of transfers to a federal prison, of the receiving penal system. Defendants must provide the recipient institution with a statement of why Rhode Island facilities are inadequate for the transferred inmate and what would be an appropriate treatment program and the reasons therefor."

sions were reached by the courts in Barrett v. Boone, *supra,* and Hoitt v. Vitek, *supra.* And see Ault v. Holmes, *supra.*

■ In this circuit, however, guidelines for minimum procedural due process requirements were established by the Court of Appeals in Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied sub nom. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). The trial judge had ordered that prisoners facing punitive segregation or other punishment were entitled to a specific catalogue of procedural requisites. Sostre v. Rockefeller, 312 F.Supp. 863, 884 (S.D.N.Y.1970). These procedural requirements were essentially the same as those ordered for prisoners facing transfer by the courts in Gomes v. Travisono, *supra;* Barrett v. Boone, *supra;* and Hoitt v. Vitek, *supra.* The Second Circuit, however, disagreed with the trial judge's conclusion "that each of the procedural elements incorporated in her mandatory injunction are necessary constitutional ingredients of every proceeding resulting in serious discipline of a prisoner." 442 F.2d at 198. The Court of Appeals concluded:

> "In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him . . . and afforded a reasonable opportunity to explain his actions." (footnote omitted) *Id.*

The court thus established the standards in this circuit for minimal guarantees of procedural due process for prisoners faced with such denial or deprivation of interests as are claimed by plaintiff. See Cloud v. Manson, Civil No. 14,063 (D.Conn. May 3, 1972); Banks v. Norton, 346 F.Supp. 917 (D.Conn.1972); Newkirk v. Butler, *supra.* Consequently, what this Court said in Cloud v. Manson, *supra,* at 6, with respect to prison disciplinary hearings is equally applicable here:

> "In the light of Sostre v. McGinnis, it is clear that in prison disciplinary hearings procedural due process does not require written notice of the charges against the prisoner before the hearing, as long as the prisoner is fairly confronted with the accusation and informed of the evidence against him. Nor is the right to counsel or counsel substitute mandatory, although the defendant Manson has stated that counsel substitute is now allowed as a matter of state policy. Nor is it required that a prisoner be allowed to confront and cross-examine adverse witnesses, or to present witnesses and evidence in his own behalf, as long as he is afforded a reasonable opportunity to explain his actions."

To be sure, in particular circumstances the Constitution requires more comprehensive procedural protections: *e. g.,* where the individual is faced with the loss of the "conditional liberty" of parole, Morrissey v. Brewer, *supra,* or probation, Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). Sostre v. McGinnis, *supra,* indicates the minimum which due process requires, not the maximum. Nieves v. Oswald, 477 F.2d 1109 (2d Cir. 1973).

■ In the circumstances of the case before the Court, however, the balance of interests in issue is weighted heavily in favor of the state. The public defender handling plaintiff's appeal from his conviction following the "baseball bat" assaults testified at the hearing that transfer of plaintiff to Marion would not hamper his appeal. Defendant Manson stated that plaintiff would be brought back to the state for parole hearings or any other proceedings requiring his presence. The defendants concede that transfer will make it difficult, if not impossible, for plaintiff to have visits from his family, although this deprivation is to some extent involved in any prison transfer. Against these interests are the pressing concerns

of the state to remove plaintiff from the Somers environment and to enable him to be released from administrative segregation. Plaintiff's long record of violence, both before his incarceration at Somers and within that institution, throws defendant Manson's dilemma into sharp relief. It was certainly not reasonable to release plaintiff into the general Somers prisoner population and risk another "baseball bat incident." Yet plaintiff's rehabilitation would be better served if he could be afforded freedom from segregation and more contact with other prisoners.[11] In this situation, defendant Manson was amply justified in seeking to expeditiously transfer plaintiff to another institution. The hearing procedure utilized in this case was sufficient under the circumstances, and adequately complied with the requirements set forth in Sostre v. McGinnis, *supra*. Plaintiff was given notice that transfer was being considered when defendant Zizzamia talked to him on September 5, 1973. It is inconceivable that plaintiff was not aware that the transfer was being considered because of his long history of violent behavior. And plaintiff was given adequate opportunity at the hearing on September 10, 1973, to offer reasons why he should not be transferred. I find that plaintiff was afforded the minimum requirements of due process.[12]

Accordingly, the complaint is dismissed.

So ordered.

---

11. The parties have submitted conflicting evidence, in the form of affidavits, as to the quality of the rehabilitative programs at Marion and the policy there with respect to initial segregation of newly-arrived transferee prisoners. These matters have not been developed to any great extent in these proceedings, and I find it unnecessary to resolve them here. Plaintiff's transfer was clearly "in the best interest of the state" and thus was amply justified under Conn. Gen.Stats. § 18–91, regardless of whether "special facilities" for plaintiff's benefit were available at Marion. And as defendant Manson testified at the hearing, transfer of plaintiff to another institution was the only means by which plaintiff could be released from administrative segregation into a general prisoner population.

12. The circumstances of this case are thus quite different from those in Gomes v. Travisono, *supra*, where eleven members of the Afro-American Society were abruptly taken from their cells late at night and transferred by state police car to prisons in other states without notice or hearing of any kind; in Capitan v. Cupp, *supra*, where a prisoner was transferred to an institution 2,000 miles away without a hearing or any opportunity to disprove the prison authorities' allegation that he was involved in the narcotics trade in the Oregon prison where he was incarcerated; in Hoitt v. Vitek, *supra*, where eleven prisoners were transferred from New Hampshire State Prison to the federal penitentiary in Lewisburg, Pennsylvania, without notice, without a statement of reasons for the transfer, without opportunity to contact family or counsel, and without a hearing; in Ault v. Holmes, *supra*, where a prisoner was transferred with one hour notice and no hearing after writing a letter to his family that was critical of the prison administration; or in Newkirk v. Butler, *supra*, where prisoners were transferred without a hearing following attempts to organize a union within the prison.

Moreover, plaintiff contends that he was denied equal protection of the laws because he was not afforded the due process rights provided prisoners before they are placed in segregation. This claim fails on two grounds. First, Sostre v. McGinnis, *supra*, Cloud v. Manson, *supra*, and Newkirk v. Butler, *supra*, indicate that in this circuit prisoners facing segregation and those facing transfer are entitled to the same procedural rights. Second, the determination of what process is due depends upon the particular circumstances in question, and thus the comparison between prisoner transfer and placing prisoners in segregation may not be appropriate.