Owen **BEATHAM** and Donald **J. LaReau,**
and all others similarly situated

v.

John **R. MANSON,** Commissioner of Corrections, State of Connecticut, Richard **M. Steinert,** Superintendent, **CCI,** Enfield.

**Civ. No. H-111.**

United States District Court,
D. Connecticut.

Dec. 26, 1973.

Owen Beatham, pro se.

Robert K. Killian, Atty. Gen., Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn., for defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

BLUMENFELD, Chief Judge.

Plaintiff [1] is an inmate at the Connecticut Correctional Institution, Enfield (hereinafter "Enfield"), having been transferred to Enfield from the Connecticut Correctional Institution, Somers (hereinafter "Somers"). Plaintiff alleges that the Connecticut Department of Correction pays prisoners who satisfactorily complete work assignments at rates which vary from 38 cents to 74 cents per working day. While at Somers plaintiff had worked up to a 59 cents-per-day pay rate. Upon his transfer to Enfield, plaintiff found himself returned to a 38 cents-per-day pay rate, although he had performed his work at

---

1. The complaint was originally brought in the name of two specific plaintiffs. One of the named plaintiffs, Donald J. LaReau, was released on parole subsequent to the filing of the complaint. Since the complaint is now moot as to him, I treat the complaint as having been filed by a single named plaintiff.

Somers in all respects satisfactorily. Plaintiff further alleges that some transferees from Somers to Enfield do not forfeit their existing positions on the pay scale. Based on these factual allegations, plaintiff has brought a class action under the Civil Rights Act, 42 U.S.C. § 1983, seeking declaratory and injunctive relief for violation of his rights under the Fourteenth Amendment.

Defendants, who are various officers of the Connecticut Department of Correction and its Correctional Institutions, have moved for summary judgment on the ground that payment of any compensation to state prisoners is a matter of grace which the state may condition in any manner it chooses. Thus defendants argue that plaintiff has failed to allege the denial of any federally protected right.

I doubt defendants are prepared to argue seriously that because the state need not provide compensation in the first place, therefore *any* condition may be attached to the payment of compensation to prisoners, such as payment only to prisoners of certain races or religions, free of federal scrutiny. And in fact, defendants' decision to move for summary judgment rather than for a motion to dismiss appears to be based on the belief that no improper denial of equal protection has occurred in this case, rather than the belief that plaintiff is not entitled to the equal protection of the laws. Thus defendants have attached to their motion for summary judgment the affidavit of defendant Richard M. Steinert, Superintendent of Enfield. This affidavit includes the following declarations:

"As contrasted with [Somers] the institution at Enfield is a minimum security institution and generally transfers from Somers to Enfield are highly desired by inmates.

The following are the procedures used in placing inmates in job assignments, in the absence of unusual circumstances:

a. Transfers from Somers to Enfield are made on Thursdays so that inmates can be settled prior to the weekend for visiting purposes.

b. Upon such transfer the job detail assigned to inmates is window washing until they are evaluated for a more permanent job assignment. Generally this job assignment takes place within one week of the transfer.

c. Placement in a more permanent job assignment turns upon such factors as the inmate's skill, security of the institution, job openings and the inmate's job preference.

Absolutely no favoritism is involved in placing an inmate in a job assignment. Any difference in pay scales among inmates is entirely due to the factors set forth in subparagraph (c) above."

In an opposing affidavit submitted by a former plaintiff, see n. 1, *supra,* it is stated that defendant Steinert has represented that the reason for the abrogation of the pay scale rank of transferees to Enfield from Somers is the different budget of Enfield.[2] The affidavit goes on to maintain that transferees are not forewarned of their loss of pay, that transfer serves to eliminate overcrowding at Somers, and hence that inmates are under pressure to accept such transfers, that pay scale rank is ordinarily reduced only for disciplinary reasons,[3]

2. Paragraph 3 of Mr. LaReau's affidavit states:

"At the written direction of Commissioner John R. Manson, I met with Superintendent Steinert on June 26, 1973, and contrary or in conflict to the subsections of Paragraph 5 of Mr. Steinert's affidavit, I was advised that the reason for abrogating an inmate's earned pay scale when he

transfers to CCI, Enfield from Somers Prison is because CCI, Enfield operates on a different budget."

3. Mr. LaReau states in paragraph 7 of his affidavit:
"To the best of my knowledge, the policy of the Connecticut Department of Corrections policy regarding inmate pay is that the only instances when an inmate is subject to earned pay scale forfeiture, is

that reducing an inmate's pay scale rank merely because of his transfer to Enfield is irrational and arbitrary (because other privileges earned at Somers, such as "good time" and spending allowances, are carried over intact at Enfield), and finally that the reduction of pay scale rank for a non-disciplinary reason such as transfer sabotages the prisoner rehabilitation which the pay scale otherwise seeks to promote.

### Facts

██ Comparing the two affidavits submitted by the parties, I find no dispute as to the material facts of the case.[4] There is no necessary conflict between the budgetary considerations expressed by defendant Steinert to LaReau, see n. 2, *supra*, and the considerations expressed by defendant Steinert to the Court. The affidavits do not raise a genuine issue with respect to the fact that a pay scale keyed to job assignments exists at Enfield, rank in which is controlled by the factors set forth in defendant Steinert's affidavit. A transferee from Somers loses his seniority at Somers and starts over again at Enfield, unless he has skills for a job in which Enfield has an opening which will allow him to start at Enfield at a higher rate of pay then the 38 cents-per-day base rate. The pay scale at Enfield is tied in to the Enfield budget, which will not permit new positions to be created on the pay scale to accommodate transferees from Somers who have been earning more at Somers than they will earn at any available job at Enfield. Implicit in defendant Steinert's affidavit is the proposition that the seniority system within Enfield is not disrupted by bumping from their positions on the Enfield pay scale men with less overall seniority than transferees from Somers, so that such transferees might retain their pre-transfer rates of pay.

### Plaintiff's Claims for Relief

Reading plaintiff's complaint with the liberality due to pro se pleadings, see Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), and hence treating as if incorporated in the complaint the argumentative portions of the affidavit in opposition to defendants' motion for summary judgment, I gather that plaintiff finds in the set of facts recited above a basis for attack on three fronts. It appears that plaintiff asserts that federal rights are violated by (1) other than voluntary or disciplinary transfers of inmates from Somers to Enfield; (2) the refusal of defendants to give transferees to Enfield a pay scale rank equal to that held by the transferees at Somers; and (3) the inequality of treatment among the transferees from Somers to Enfield, insofar as some transferees receive assignments at Enfield to jobs with equal or higher pay scale rank than their prior work assignments at Somers.

### Due Process Constraints on Prison Transfers

As to the voluntariness of inmate transfers from Somers to Enfield, plaintiff's position appears to be that while an inmate can successfully refuse such a transfer, his objection may result in a loss of privileges at Somers. Plaintiff also seems to object to the fact that many inmates acquiesce in their transfer from Somers to Enfield in ignorance of the fact that they may suffer a loss

when the inmate receives a misconduct report or poor work report."

4. I take judicial notice of Section 85 of Title 18 of the Connecticut General Statutes, which provides in pertinent part: "The commissioner [of correction], after consultation with the council and the personnel policy board, shall establish a schedule of compensation for services performed on behalf of the state by inmates of any institution or facility of the department [of correction]. Such schedule shall recognize degrees of merit, diligence and skill in order to encourage inmate incentive and industry."

in pay scale rank through such a transfer. Plaintiff points out that a reduction in pay scale rank, other than as an incident of an inmate's transfer from Somers to Enfield, is supposedly a disciplinary measure. Thus plaintiff seems to argue that federal rights are violated when an inmate is transferred from Somers to Enfield without his informed consent or without some misconduct on his part which would justify his reduction in pay scale rank at Enfield.

■■ Plaintiff's position in this regard is untenable. It is true that a prisoner's right to due process may be infringed if he is arbitrarily subjected to a serious deprivation. See, e.g., Morrissey v. Brewer, 408 U.S. 471, 481–484, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Sostre v. McGinnis, 442 F.2d 178, 194–199 (2d Cir. 1971), cert. denied 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, cert. denied, Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d. 254 (1972). Due process has thus been held to place some strictures on the interstate transfer of a prisoner, largely because of the resulting deprivation of that prisoner's proximity to family, friends, and counsel. See Croom v. Manson, 367 F.Supp. 586 (D.Conn. Nov. 14, 1973); Park v. Thompson, 356 F.Supp. 783 (D.Haw. 1973); Gomes v. Travisono, 353 F.Supp. 457 (D.R.I.1973); Capitan v. Cupp, 356 F.Supp. 302 (D.Or.1972). Although the same sort of deprivation may result from an *intrastate* transfer of a prisoner, the magnitude of such deprivation has generally been held insufficient to invoke federal due process protection vis-à-vis intrastate transfers. See United States ex rel. Stuart v. Yeager, 293 F.Supp. 1079, 1081 (D.N.J.1968), aff'd 419 F.2d 126 (3d Cir. 1969), cert. denied 397 U.S. 1055, 90 S.Ct. 1400, 25 L.Ed.2d 673 (1970); Lewis v. Gladden, 230 F. Supp. 786 (D.Or.1964). See also Bell v. Warden, 207 Md. 618, 113 A.2d 482 (1955). The incidental deprivation of the sort of privileges here in issue, including the type of job previously held and the pay or other benefits earned

through that job, is similarly insufficient to bring an intrastate transfer within the purview of the Fourteenth Amendment's guarantee of due process. See Hanvey v. Pinto, 441 F.2d 1154 (3d Cir. 1971). See also Lloyd v. Oliver, 363 F. Supp. 821, 822 (E.D.Va.1973). Only when intrastate transfers have been made for apparently disciplinary reasons, with the prisoner being deprived of the benefits of a minimum-security institution by being moved to a maximum-security institution, have due process strictures been imposed on such transfers. See Newkirk v. Butler, 364 F.Supp. 497 (S.D.N.Y.1973); White v. Gillman, 360 F.Supp. 64 (S.D.Iowa 1973).

## *Enfield's Separate Pay Scale System Does Not Deny Equal Protection*

■ Plaintiff apparently argues that it is unconstitutionally discriminatory for the state to pay more to Enfield inmates who have earned high rank in the Enfield pay scale than is paid to transferees to Enfield who have held equally high rank in the Somers pay scale. Plaintiff properly concedes that defendants need only show some rational basis for their pay scale system. The appropriate standard was recently set forth by the Supreme Court in a case closely analogous to the present matter, McGinnis v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). Indeed, the Supreme Court was there dealing with prisoners' rights to earn "good time," and thus dealt with liberty itself, surely a more important wage than the 21 cents per day here in issue. Yet the Court nevertheless applied a lenient test for compliance with the Equal Protection Clause.

"We note, further, that the distinction of which appellees complain arose in the course of the State's sensitive and difficult effort to encourage for its prisoners constructive future citizenship while avoiding the danger of releasing them prematurely upon society. The determination of an optimal

time for parole eligibility elicited multiple legislative classifications and groupings, which the court below rightly concluded require only some rational basis to sustain them. [Citations omitted.] Appellees themselves recognize this to be the appropriate standard. For this Court has observed that 'the problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913). We do not wish to inhibit state experimental classifications in a practical and troublesome area, but inquire only whether the challenged distinction rationally furthers some legitimate, articulated state purpose." McGinnis v. Royster, *supra,* 410 U.S. at 269–270, 93 S.Ct. at 1059.

It is important to note that in *Royster,* as in the instant case, the challenged distinction in the treatment of a class of prisoners was justified not in terms of the individual characteristics or conduct of the discriminated-against class, but in terms of the institutions in which that class was incarcerated. All that was required to support the discrimination was a showing of a rational relationship between the purpose assertedly served by the challenged distinction and the nature of the institutions whose inmates composed the discriminated-against class.

"The Commissioner defends the distinction by noting that 'state prisons differ from county jails with respect to the purpose, usage and availability of facilities.' State prisons are 'intended to have rehabilitation as a prime purpose and the facilities at these institutions are built and equipped to serve this purpose.' . . . [¶] We pass no judgment on the success or merits of the State's efforts, but note only that at state prisons a serious rehabilitative program exists. County jails, on the other hand, serve primarily as detention centers. . . . [¶] These significant differences afford the basis for a different treatment within a constitutional framework. . . . As the statute and regulations contemplate state evaluation of an inmate's progress towards rehabilitation, in awarding good time, it is reasonable not to award such time for pretrial detention in a county jail where no systematic rehabilitative programs exist and where the prisoner's conduct and performance are not even observed and evaluated by the responsible state prison officials." 410 U.S. at pp. 270–273, 93 S.Ct. at 1060, 1061.

The articulated state purpose of the pay scales here in issue is "to encourage inmate incentive and industry." Conn. Gen.Stats. § 18–85 (see n. 4, *supra*). Prison officials are to be accorded considerable latitude in seeking to further this undoubtedly legitimate purpose. Thus, it is not a denial of equal protection to pay prisoners for work by either monetary compensation or good time allowance, at their option. Baldwin v. Smith, 446 F.2d 1043 (2d Cir. 1971). On the record before the Court in this case, it might well be within the bounds of such discretion for the state to provide no pay at all for inmates at Enfield, even though pay were provided to inmates at Somers, if the state were operating on the theory that other aspects of the Enfield environment which make Enfield generally more desirable to inmates than Somers, would suffice "to encourage inmate incentive and industry" at Enfield, thus rendering unnecessary the compensation provided at Somers as an incentive to good behavior.

In fact, the state has directed that compensation be paid to inmates at *all* its correctional institutions, Conn.Gen. Stats. § 18–85 (see n. 4, *supra*), but in the exercise of their discretion in meeting this statutory mandate, defendants have elected not to credit transferees to Enfield with the pay scale rank they may have acquired at Somers. The problem is essentially one of apportioning

seniority among members of two distinct seniority systems, a problem often encountered by labor negotiators in the wake of a merger. *See, e. g.,* Hardcastle v. Western Greyhound Lines, 303 F.2d 182 (9th Cir. 1962); Wheeler v. Brotherhood of Locomotive Firemen and Enginemen, 324 F.Supp. 818 (D.S.C. 1971). The seniority system in effect at Enfield declines to "dove-tail" the seniority acquired by transferees at Somers with seniority acquired by inmates who have been incarcerated continuously at Enfield. This decision not to "dove-tail" seniority rights represents a decision to honor the expectations of inmates who have acquired pay scale rank at Enfield, over the expectations of transferees to Enfield who might have acquired higher rank elsewhere. The general desirability of Enfield might well be deemed to compensate transferees for any loss of pay scale rank, making it preferable to impose the risk of a loss of rank or seniority on transferees rather than on continuing inmates at Enfield. Thus the treatment of transferees under the Enfield pay scale system is entirely rational; it would survive scrutiny under the National Labor Relations Act, and would seem to be equally permissible in the context of the broad discretion accorded officers of a correctional institution.[5]

Defendants could, of course, avoid loss of pay scale rank by any prisoner, transfers notwithstanding, by maintaining transferees at whatever pay scale rank they had acquired prior to their transfer, without demanding any offsetting diminution in the pay scale rank of continuing inmates of Enfield. But budgetary considerations provide a rational basis for defendants' refusal to take this course of action. Obviously there must be some upper limit to compensation paid to inmates, both individually and collectively, even though there may well be a direct correlation between the amount of compensation and the degree of encouragement of "incentive and industry" offered by the tendering of compensation. In deciding on the pay scale at Enfield, defendants must of necessity exercise discretion in allocating the Department of Corrections' finite fiscal resources. It rationally serves the purpose of the compensation program while accommodating budgetary considerations to establish a pay scale system involving a fixed number of positions at each specified rank, and to assign transferees only to such positions as are open, rather than to inject uncertainty into the overall cost of the compensation program by tailoring each transferee's pay scale rank to his former rank at Somers. To paraphrase the Supreme Court, the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited prisoner compensation funds among the myriad of potential recipients. See Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

*Work Assignments of Transferees Not Arbitrary or Capricious*

Besides his equal protection challenge to defendants' treatment of transferees

---

5. The rule invariably applied to assertions that a collective bargaining representative has abused its discretion in negotiating seniority rights was set forth in Ford Motor Co. v. Huffman, 345 U.S. 330, 337–338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953): "Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented. . . . Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, *subject always to complete good faith and honesty of purpose in the exercise of its discretion.*" (Emphasis added.)

in general, insofar as they lose the pay scale rank they held at their former place of incarceration, plaintiff also appears to challenge defendants' treatment of transferees vis-à-vis one another, insofar as some transferees are assigned immediately to jobs of high pay scale rank, while plaintiff and other transferees are forced to start again at the bottom of the pay scale. Since this latter challenge is directed to the treatment of individual transferees as individuals rather than as members of any actual or imagined class, it is subject to due process rather than to equal protection analysis.

■ It is clear that federal courts cannot undertake to review every official action taken against a prisoner which results in that prisoner being treated differently from any other prisoner. As the Supreme Court has noted: "The relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen. For state prisoners, eating, sleeping, dressing, washing, working, and playing are all done under the watchful eye of the State, and so the possibilities for litigation under the Fourteenth Amendment are boundless." Preiser v. Rodriguez, 411 U.S. 475, 492, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973). Even though the contested treatment of a prisoner may have resulted in his having been placed in a different position relative to other prisoners, this "inequality" does not automatically give rise to a judicially cognizable claim of a denial of equal protection merely because the aggrieved prisoner chooses to assert in a civil rights suit that the action taken against him by prison officials bore no rational relationship to an articulated, legitimate state purpose.

■ When statutes, regulations, or even administrative policies are alleged to be the basis for discriminatory treatment of an individual prisoner, equal protection review is proper. But when treatment of a prisoner as an individual is concerned, courts lack the time or the competence to attempt to ascertain if each aspect of the treatment of an individual prisoner which differs from treatment of prisoners generally is rationally related to an articulated, legitimate state purpose. The only area of inquiry proper in such cases—where the *nature* of the treatment accorded a prisoner is not challenged, but only the fact that this treatment differs from that accorded other prisoners—is whether the aggrieved individual has been treated arbitrarily or capriciously, *i. e.*, whether the prisoner has been treated so irrationally as to have been denied due process of law—"a summarized constitutional guarantee of respect for those personal immunities which . . . are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,' . . . or are 'implicit in the concept of ordered liberty.' [Citations omitted.]" Rochin v. California, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952).

Usually due process analysis of prisoner grievances is confined to whether a prisoner has been accorded appropriate *procedural* protections before being subjected to the deprivation of an interest protected by the Due Process Clause of the Fourteenth Amendment. See, *e. g.*, Morrissey v. Brewer, *supra* (revocation of parole); Sostre v. McGinnis, *supra* (imposition of punitive segregation). But implicit in these decisions is the proposition that due process also extends some *substantive* protection against wholly arbitrary official conduct, for procedural protection would be rendered largely illusory if state action could be premised on the flip of a coin. Thus *Morrissey* speaks of "treating the parolee with basic fairness" and sets the procedures to be employed in "the determination that *reasonable* grounds exists for revocation of parole." 408 U.S. at 484, 485, 92 S.Ct. at 2602 (emphasis added.) In stating that "[i]f substantial deprivations are to be visited upon a

prisoner, it is wise that such action should at least be premised on facts rationally determined," since "our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials," Sostre v. McGinnis, *supra*, 442 F.2d at 198, *Sostre* also gave recognition to the substantive aspects of the Due Process Clause.

■ The basic substantive due process guarantee against arbitrary or capricious official action applies even where procedural due process does not, as where the "interest" at stake is not "protected," or where the aggrieved party has been denied access to an as yet potential benefit, but has not been deprived of an interest in a benefit already acquired. Thus it is precisely because "an assertion of arbitrary power . . . offends due process" that regardless of "whether an abstract right

to public employment exists . . . constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." Wieman v. Updegraff, 344 U.S. 183, 191–192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952).[6] It was in the same vein that the Second Circuit found mere applicants to public housing possessed of a due process right to non-arbitrary selection procedures. "It hardly need be said that the existence of an absolute and uncontrolled discretion in an agency of government vested with the administration of a vast program, such as public housing, would be an intolerable invitation to abuse." Holmes v. New York City Housing Authority, 398 F.2d 262, 265 (2d Cir. 1968).

■■ The right to have a job of his choice is not within the constitutionally protected "liberty" of plaintiff, a convicted felon. It follows that plaintiff is

---

6. *Compare* Board of Regents v. Roth, 408 U.S. 564, 577–578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), holding that no hearing was required when a non-tenured teacher's contract was not renewed [no allegation of arbitrariness; first amendment claim not reached] with Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), holding that even if a teacher's lack of tenure vitiates his procedural due process claim to a hearing on non-renewal of his contract, he can still prevail upon proof of a claim that his contract was not renewed because of his having engaged in conduct protected by the First Amendment: "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely."

Among the reasons upon which the government may not rely in denying a benefit are those which are arbitrary or capricious. Freedom from arbitrary action is itself an aspect of the "liberty" accorded substantive protection by the Due Process Clauses of the Fifth and Fourteenth Amendments. As Mr. Justice Harlan wrote in dissent from the dismissal of an appeal: "The full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees

elsewhere provided in the Constitution. . . . It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions . . . . " Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1962), cited with approval, Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), quoted with approval, Roe v. Wade, 410 U.S. 113, 169, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (concurring opinion of Stewart, J.). Arbitrary governmental action indirectly infringes this abstract interest in "liberty," thereby effecting a denial of substantive due process, even where procedural due process is not required because the interest *directly* affected by the arbitrary action is not within the ambit of constitutionally protected "life, liberty, or property." *Cf.* Board of Regents v. Roth, *supra*, 408 U.S. at 569–575, 92 S.Ct. 2701; Morrissey v. Brewer, *supra*, 408 U.S. at 480–482, 92 S.Ct. 2593. This abstract interest in freedom from arbitrary action is especially important in the context of prison life, for it is one of the few aspects of "liberty" guaranteed even to prisoners, who are otherwise dependent on the non-arbitrary discretion of prison officials for access to the opportunities to pursue a livelihood, enjoy leisure, seek affection, or communicate with others, which form the very essence of the constitutionally protected "liberty" of persons not convicted of any crime.

entitled to relief if, but only if, his work assignment at Enfield was decided arbitrarily or capriciously. Plaintiff has, however, made no allegation of such arbitrary or capricious action, let alone provided the prima facie showing which would be necessary for this Court to grant an adversary hearing on the matter. *Cf.* Board of Regents v. Roth, 408 U.S. 564, 574–575, 92 S.Ct. 2701, 33 L. Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 599, n.5, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1973). I find nothing offensive to basic substantive due process in the bare fact that transferees from Somers to Enfield receive work assignments at Enfield which pay varying rates of compensation. When this fact is viewed in the light of defendant Steinert's statement attributing any differences in job assignments to "such factors as the inmate's skill, security of the institution, job openings and the inmate's job preference," it is clear that on the record before me defendants' method of assigning jobs to transferees is perfectly permissible.

As was said in United States ex rel. Stuart v. Yeager, *supra,* 293 F.Supp. at 1081: "Although the court feels great sympathy for the plight of petitioner, it believes that no constitutional right of petitioner is abridged by a transfer between [correctional institutions]." And as has been stated previously by another judge of this very Court: "While [plaintiff's] position is understandable . . . [t]here is no constitutional right to a particular job in a correctional institution." Banks v. Norton, 346 F.Supp. 917, 921 (D.Conn.1972). Plaintiff here claims but 21 cents per day more than he is getting at Enfield, in order to receive the same amount as he received at Somers. This amount may seem to some too trifling, even if afforded to the entire class plaintiff purports to represent,[7] to withhold from plaintiff if it risks sabotaging his personal effort at rehabilitation. But this Court's responsibility for protecting fed-

erally guaranteed rights does not confer license to review the policy judgments of state correctional officers merely because such judgments are arguably unwise. The compensation policies here in issue are neither arbitrary nor irrational. Whether considered separately or together, the claims of the plaintiff do not amount to the deprivation of any civil rights. Enter judgment for the defendants.

So ordered.

---

7. Plaintiff's affiant asserts that Enfield houses up to 400 inmates. It is, of course,

unlikely that all the inmates at any one time are within the class of transferees.